COMMONWEALTH *vs.* DANIEL R. MARTIN.

Middlesex. November 4, 1975. — February 2, 1976.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Assault,* Defense of others. *Practice, Criminal,* Charge to jury; Exceptions: general exception.

In a trial on charges arising from a clash between inmates and guards at a prison, evidence that the defendant heard another inmate calling for help and saw the inmate being beaten by prison officers with clubs and a metal mop handle as he lay on the floor and that he then struck the officers with his fists in an effort to pull them off the inmate was sufficient to lay a basis for a charge to the jury on the defendant's claimed justification that use of force to protect another is privileged. [642-644]

Where the transcript of a criminal trial suggested that the judge was looking at the defendant's written request for instructions when defense counsel took his exception to the omission of certain instructions by referring to the numbers in the written request and where, in light of the line of interrogation counsel had pursued throughout the trial, a colloquy with counsel at the bench, and counsel's summation, the judge must have been aware that the omitted instructions constituted the keystone of the defense, the exception was sufficient to advise the judge of the asserted error. [644-646]

Use of force, not excessive in the circumstances, against another to protect a third person is justified when a reasonable person in the actor's position would believe that intervention was necessary for the protection of the third person and that the third person would be justified in the circumstances in using such force to protect himself. [646-652]

INDICTMENTS found and returned in the Superior Court on October 25, 1972.

The cases were tried before *Lappin, J.* The cases were reported by the Appeals Court.

*Joseph F. Flynn* for the defendant.

*Alan L. Kovacs,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendant Daniel R. Martin appeals under G. L. c. 278, §§ 33A-33G, from his multiple convictions, described in the margin,[1] arising from a clash between inmates and guards at Massachusetts Correctional Institution at Concord on October 15, 1972. The issue on appeal is whether the trial judge committed error in failing to instruct the jury with respect to the defendant's claimed justification or defense, namely, that the acts of which he was accused were part of an attempt on his part to come to the aid of a fellow inmate and friend, Gene Tremblay (tried and convicted together with the defendant[2]), who was being unlawfully beaten by

---

[1] With regard to the alleged attack on Officer Quealey, the defendant was convicted of assault and battery on a guard of a correctional institution (G. L. c. 127, § 38B), assault and battery with a dangerous weapon (G. L. c. 265, § 15A), and armed assault with intent to kill (the indictment was for such assault with intent to murder, G. L. c. 265, § 15, see *Commonwealth* v. *Demboski,* 283 Mass. 315, 321-324 [1933]).   As to the alleged attack on Officer Taylor, the defendant was convicted of assault and battery on a guard of a correctional institution, and assault with a dangerous weapon (G. L. c. 265, § 15B), the judge having directed a verdict on the charge of battery with a dangerous weapon.

[2] Tremblay was convicted of assault and battery on guards of a correctional institution.

Only the defendant Martin's convictions are before us on this appeal.

prison guards. The Commonwealth, without expressly conceding the matter, does not actually dispute that the evidence adduced by the defendant at the trial provided a basis in fact for such instructions. It contends, however, that no proper request was made for the instructions,[3] and doubts whether the law of Massachusetts recognizes the use of force for the protection of another person as a justification or defense for the actor.

1. We sketch very briefly the facts as they appeared at trial. The prosecution was of course intent to show that the defendant's acts were simply aggressive attacks on the correction officers in a prison brawl, while the defendant strove to prove that he acted honestly and reasonably upon observing the inmate Tremblay being beaten by the officers.

According to the prosecution's case, a struggle erupted between two correction officers and two inmates as the inmates were being escorted from a second-floor segregation unit down to a first-floor area for showers and exercise. One of the inmates, Tremblay, fought with an officer near the stairwell and the officer fell or was shoved down the stairs, with Tremblay following him down. The fallen officer yelled to officers on the first floor for help, and one of them, John Quealey, restrained Tremblay, while others went to summon aid. Officer Quealey held Tremblay by the hair while pushing him toward and into an open cell on the first floor. According to the prosecution's proof, Tremblay was held in the cell but not beaten; no clubs or other weapons were used by the officers in the affray although it appeared that clubs were kept in a nearby desk.

Meantime the second inmate involved in the fight on the second floor had taken the cell keys from the other officer and released other inmates of the segregation unit. Several of the inmates, including the defendant, ran down the stairs and met officers who had arrived to give

---

[3] See also note 5 below.

help. In the melee, Officer Quealey was stabbed a number of times in the chest and once on the arm. Officer Quealey testified that as he was struggling with an inmate, he saw the defendant strike at him three times, and he saw a knife in the defendant's hand as the defendant stepped back. Other officers testified that they saw an attack by the defendant on Officer Quealey, or saw the defendant with a knife immediately after the attack (the testimony was not entirely consistent). There was further testimony that the defendant struck Frederick Taylor, a correction officer, with his fist and threatened him with a knife, saying "Back off, or I will give it to you, too."

The defendant took the stand to give his version of the facts. He was corroborated in part by the codefendant Tremblay. Because the defendant's view was obstructed by a partition between the rows of cells on either side of the second floor, he had not been able to see the fight there and did not know who had started it. When his cell was opened, he walked to the end of the partition but, seeing blood on the floor and hearing sounds of a struggle on the stairs, he started back to his cell. He then heard Tremblay calling for help and surmised that Tremblay was in grave danger. The defendant raced down the stairs and saw Officer Quealey and two other officers striking Tremblay with clubs and a metal mop handle as he lay on the floor of an open cell. Tremblay had his arms over his head and was trying to fend off the blows. He was yelling for help. The defendant struck several officers, including Officers Quealey and Taylor, with his fists in his effort to pull the officers off Tremblay. The defendant denied that he had a knife at this time; he did not stab Officer Quealey or threaten Officer Taylor with a knife. He testified that he first saw the knife on the floor where another inmate had dropped it after the stabbing of Officer Quealey.

The violence ended when assistant deputy superintendent Nicholas Genakos ordered the officers to withdraw

while he and Jon Cooke, a social worker, negotiated with the inmates. During the negotiation Cooke saw the defendant with a knife and, when Genakos asked for it, the defendant said, "We'll see how this goes." The defendant testified that he made the statement and that he did have a knife, but only for a short interval when Cooke saw it. A search by the State police after the inmates had returned peaceably to their cells failed to turn up a knife.

The evidence on the part of the defendant, summarized above, was sufficient to lay a basis for a charge to the jury on the justification claimed by him (see point 3 below). It is of course immaterial that the triers might very well, in the end, lend no credence whatever to the defendant's version of the facts. As was said in *Commonwealth* v. *Campbell,* 352 Mass. 387, 398 (1967), quoting from *People* v. *Carmen,* 36 Cal. 2d 768, 773 (1951), "However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true." See *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 746 (1975); *United States* v. *Grimes,* 413 F.2d 1376, 1378 (7th Cir. 1969), and cases cited.

2. The judge instructed the jury with respect to self-defense and even related these instructions to the question whether the defendant was privileged to use a dangerous weapon to protect himself from attack by Officer Quealey. But he gave the jury no instructions on the subject of the privileged use of force to protect another. This failure seems to have been due to the judge's belief that the claimed justification was not recognized in the law of Massachusetts.

The defendant made due request in writing for jury instructions on the subject. His request was submitted the day before the judge charged the jury. The main requested instruction (No. 9) was a quotation from the relevant statute law of Illinois as reproduced in the case of *People* v. *Johnson,* 4 Ill. App. 3d 249, 251 (1972): "A

person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. . . ." Smith-Hurd Ill. Ann. Stat. c. 38, § 7-1 (1972). Five further instructions were requested related to the subject.[4] After the judge had concluded his charge, the defendant's counsel, directing attention to the six instructions by their numbers in the written request previously handed up, excepted to the judge's failure to give any of them: "On behalf of the defendant Martin, I would like to take an exception to the failure of the Court to give my requests for instructions to the jury, No. 9, 10, 12, 13, 14 and 15 . . . ."

We do not accept the Commonwealth's suggestion that the exception was insufficient to advise the judge of the asserted error. The present case is distinct from *Commonwealth* v. *Shea*, 323 Mass. 406 (1948), cited by the Commonwealth, where the defendants attempted to take a "shot-gun exception" to so much of the charge as was inconsistent with the requests for rulings, and did not point out the portions of the charge they considered inconsistent and erroneous, despite the judge's request that they do so. *Id.* at 416; and see the bill of exceptions in that case at 78. Although it is of course possible in the context of a particular trial that a reference by numbers

---

[4] Request No. 10 stated that a person was justified in using force likely to cause great bodily harm only if he reasonably believed it to be necessary to prevent imminent death or great bodily harm to himself or another; No. 13 stated that one lawfully may do in another's defense what the other might do in his own defense; and No. 15 dealt with the bearing on the defendant's reasonable apprehension of his knowledge that the victim's habits were those of a violent, quarrelsome, and fighting man. No. 12 was garbled but seems to have been addressed to the right of a defendant to come to the aid of a person who appears to him to be a victim, but who is in fact the aggressor. No. 14 was somewhat circumlocutory but suggests that where a defendant is without knowledge or reasonable opportunity to acquire knowledge as to whether the person defended is the aggressor, his use of force still may be justified or excusable.

to a sequence of requests may not be clear or emphatic enough to alert the judge to the substance (cf. *Delancey* v. *Motichek Towing Serv., Inc.,* 427 F.2d 897, 900-901 [5th Cir. 1970]; *Burns* v. *United States,* 286 F.2d 152, 157 [10th Cir. 1961]; 5 L. Orfield, Criminal Procedure Under the Federal Rules § 30:52, at 79 [1967]), we do not think there was any such difficulty here. The transcript suggests that the judge was actually looking at the written requests when counsel took his exception but, even if he was not, he could not have been unaware, in light of the line of interrogation counsel had pursued throughout the trial, a colloquy with counsel at the bench, and counsel's summation,[5] that the privilege to defend another was the keystone of the defense. The judge's failure to charge on the matter therefore appears not to be a consequence of the defendant's failure to inform him of error in the charge, but rather to be traceable, as we have said, to the judge's view of the governing law.

3. We hold that a justification corresponding roughly to that quoted from the Illinois statute[6] is recognized by the law of the Commonwealth. Of course the justification may exist although it is not found in so many words

---

[5] The judge stated to the jury that certain instructions had been requested, "all of which I believe I have encompassed in what I have already told you." The context indicates that this comment was directed only to the requests concerning the requirements of proof (as in the defendant's requests Nos. 19-21). We do not agree with the Commonwealth's suggestion on appeal that the jury could themselves somehow have converted the judge's instructions on self-defense into suitable instructions regarding defense of another. Especially is this suggestion unacceptable because the Commonwealth has doubted whether the latter justification was available in this jurisdiction.

[6] The trial judge was bound to charge on the subject even if the instructions as requested were incorrect in particulars. See *Commonwealth* v. *Agiasottelis,* 336 Mass. 12, 15-16 (1957); *United States* v. *Grimes,* 413 F.2d 1376, 1378 (7th Cir. 1969); 5 L. Orfield, Criminal Procedure Under the Federal Rules § 30.37, at 65-66 (1967); cf. *Celanese Corp. of America* v. *Vandalia Warehouse Corp.,* 424 F.2d

in our statute law:[7]   it may be read into the definition of a statutory offense or considered a common-law adjunct to, or qualification of, the offense.   This is easily accepted and understood as to the more commonplace justification of self-defense.   See *Commonwealth* v. *Shaffer,* 367 Mass. 508 (1975), and the many cases cited; *United States* v. *Grimes,* 413 F.2d 1376, 1378-1379 (7th Cir. 1969).

There is some but not much light in the decided cases in this jurisdiction about justified force used in aid of another.   In *Commonwealth* v. *Cooley,* 6 Gray 350 (1856), H. and A. Cooley apparently interfered in the arrest of a relative, B. Cooley, by one Rice, an assistant marshal of Springfield, and they were indicted in a first count for assault on Rice as an official, and in a second count for a common assault on him.   A majority of the court held the following charge proper (although possibly too favorable to the defendants):   " [I]f Harrison and A. M. Cooley interfered, not knowing that Rice was an officer and acting in discharge of his duty, but interposed for the purpose of arresting or quelling a fight or breach of the peace, they would not be liable for so doing, unless they used more force or violence than would have been necessary for that purpose; and if they did interpose for the purpose of arresting a fight, and used more force than was necessary for that purpose, they would be liable on the second count." *Id.* at 354.   Somewhat closer in point is *Commonwealth* v. *Malone,* 114 Mass. 295 (1873), where the defendant assaulted a young girl in the

---

1176, 1181 (7th Cir. 1970) (same rule in civil cases); *Florists' Nationwide Tel. Delivery Network — America's Phone-Order Florists, Inc.* v. *Florists' Tel. Delivery Ass'n,* 371 F.2d 263, 270 (7th Cir.), cert. denied, 387 U.S. 909 (1967) (same); 9 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2552, at 630-631 (1971) (same).

[7] "Justification," including justification for use of force for the protection of others, is, however, a proper and feasible subject for legislation, and in fact has been codified in the statutes of many States.   See n.13 below.

presence of her mother, the mother struck the defendant, and the defendant retaliated, for which assault he was charged. The defendant's request for an instruction that the mother was not entitled to use force to defend her daughter was held properly refused and the following instruction properly given: "'. . . The law gives the right, if the defendant was inflicting great violence on the daughter's person. The mother had a right to use as much force as was reasonably necessary to protect her person from great injury, and if she did not use more force than was reasonably necessary for that purpose, the use of such force was no justification of the defendant's blow upon Mrs. Rennehan.'" *Id.* at 296. These cases are suggestive but laconic.[8] The paucity of direct authority is perhaps explained by the likelihood that one coming to the defense of another may himself be, or come to be, under attack, and may thus simply claim self-defense, a less esoteric justification.[9]

Whatever the precise precedents, it is hardly conceivable that the law of the Commonwealth, or, indeed, of any jurisdiction,[10] should mark as criminal those who

---

[8] In *Commonwealth* v. *Riley*, Thacher's Crim. Cas. 471 (Boston Mun. Ct. 1837), the facts would entitle a jury to find that McNally was the aggressor in beating Riley, and that Stewart, a witness, handed Riley a knife which Riley used in self-defense, killing McNally. Judge Thacher said in his charge to the jury: "Where a known felony is attempted upon the person, be it to rob or murder, the party assaulted may repel force by force; and even his servant then attendant on him, or any other person present, may interfere to prevent mischief; and if death ensue, the party so interposing will be justified." He also said: "If Stewart believed at the time, that McNally intended to kill Riley, he had a right to interfere to prevent further mischief, and to give to Riley a weapon which was necessary for his defence." *Id.* at 475, 476.

[9] It has been suggested also that cases in which the justification of third-person defense might be available have been tried on a footing of preventing crime. Cf. *Commonwealth* v. *Cooley*, cited above in the text, and *Commonwealth* v. *Riley*, note 8 *supra*.

[10] See W.R. LaFave & A.W. Scott, Jr., Criminal Law § 54 (1972); note 15 *infra*.

Commonwealth *v.* Martin.

intervene forcibly to protect others; for the law to do so would aggravate the fears which lead to the alienation of people from one another, an alienation symbolized for our time by the notorious Genovese incident.[11]  To the fear of "involvement" and of injury to oneself if one answered a call for help would be added the fear of possible criminal prosecution.[12]

It becomes necessary to sketch the conditions justifying the use of intervening protective force.  The essence is this:  An actor is justified in using force against another to protect a third person when (a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself.  The reasonableness of the belief may depend in part on the relationships among the persons involved (a matter to which we return below).  The actor's justification is lost if he uses excessive force, e.g., aggressive or deadly force unwarranted for the protective purpose.

Of course, the subject cannot be exhausted in a paragraph.  Without subscribing in advance to all the relevant provisions of the Model Penal Code of the American

---

[11] This occurred on March 13, 1964.  See N.Y. Times, March 14, 1964, at 26, col. 4.

[12] It is instructive that the laws of some countries in continental Europe denounce as a crime the failure to render help in given circumstances.  See Dawson, *Negotiorum Gestio*:  The Altruistic Intermeddler, 74 Harv. L. Rev. 817, 1073, 1101-1114 (1961).  Thus art. 330c of the West German Criminal Code, as amended in 1953, provides (translation by Professor Dawson):  "Whoever does not render help in cases of accident, common danger or necessity although help is required and under the circumstances is exactable, and in particular is possible without danger of serious injury to himself and without violation of other important [wichtige] duties, will be punished by imprisonment up to one year or by fine."  *Id.* at 1104-1105.

Law Institute, we recommend it for study.[13]   Accelerated by that Code, the trend, which is exemplified by legislation adopted in many States,[14] has been to interweave closely the justification of defense of a third person with self-defense; to eliminate some earlier authority restricting the justification of third-person defense to situations where the third person is seen retrospectively to have been entitled to use force in his own defense (regardless of the belief, which might be mistaken, of the "reasonable person" at the time);[15] and to remove earlier artificial or factitious restrictions of the justification, e.g., restrictions to protection of spouse, child, parent, master, or servant.[16]

One such possible factitious restriction was rejected, we think correctly, in *United States* v. *Grimes*, 413 F.2d 1376 (7th Cir. 1969), a case resembling the present. The defendant Grimes, an inmate of the Federal penitentiary in Marion, Illinois, seeing (as he claimed) a fellow inmate, Reid, being beaten by prison guards with metal flashlights, ran to Reid's aid and struck one of the

---

[13] The principal sections of the Code (Proposed Official Draft 1962) to be consulted are §§ 3.05(1), 3.09(1)-(2), 3.04(1), (2)(a)(i), (b); and see Tentative Draft No. 8 (1958) for commentary on these sections.

[14] It is reported that in the past twenty years some twenty-one States have adopted legislation in the field of "justification"; another fifteen States, and the Federal government as well, are considering such legislation.   See Note, Justification: The Impact of the Model Penal Code on Statutory Reform, 75 Colum L. Rev. 914, 914-915 (1975).   The legislation on the use of force in defense of a person is analyzed at 932-939.

[15] See W.R. LaFave & A.W. Scott, Jr., *supra* note 10; G. Williams, Criminal Law: The General Part § 73 especially at 207 (2d ed. 1961).   In New York, for example, the restrictive decision of *People* v. *Young*, 11 N.Y.2d 274 (1962), may be taken to be overruled by N.Y. Penal Law § 35.15 (McKinney 1975), enacted in 1965-1968. See also 12 DePaul L. Rev. 155 (1962); 8 Minn. L. Rev. 340 (1924); 20 Wash. & Lee L. Rev. 98 (1963).

[16] See the comment on § 3.05 of the Model Penal Code in Tentative Draft No. 8 at 31 (1958).

guards. Grimes was indicted and convicted of assault upon an employee of a United States correctional institution (18 U.S.C. §§ 111, 1114 [1970]). On appeal, it was held that the trial judge erred in refusing a jury instruction regarding justified use of force to protect a third person. The court spoke as follows to the point that, while the justification might be suitable generally, it should be rejected in the prison context because of its effect on institutional discipline: "We perceive no serious threat to prison discipline from a defense which merely protects inmates from unauthorized physical abuse by overzealous officials. Our decision in no way limits the power of prison officials to restrain or subdue unruly inmates, to carry out all reasonable orders necessary for the maintenance of prison discipline, or to cope with attempted assaults or escapes by prison inmates. See A.L.I. Model Penal Code §§ 3.07, 3.08 (Proposed Official Draft 1962). The Government's concern that recognition of this limited defense will emasculate Section 111 is belied by the fact that since 1905, when this statute was originally enacted, this is apparently the first such case." *Id.* at 1379.

We agree with the court in the *Grimes* case that the justification of defense of a third person does not necessarily stop short at the prison gates. But the fact that an episode occurs in prison may have considerable significance. So the question of the reasonableness of a belief that an inmate would be justified in using force against a prison guard, thus justifying intervening protective force, is conditioned by the fact that the guard, by the nature of his job, is himself privileged to apply force to inmates when necessary to preserve order in the institution.[17]

---

[17] See Model Penal Code § 3.08(5) (Proposed Official Draft 1962) (use of force by persons with special responsibility for care, discipline or safety of others — warden or other authorized official of a correctional institution). Cf. *State* v. *Rigler,* 266 A.2d 887 (Super. Ct. Del. 1970) (parent disciplines child; defendant not justified in intervening).

Therefore the guard's mere taking an inmate into custody or holding him in custody would not be a proper occasion for intervening force. This may have an important bearing on the present case in the event of retrial.

*Judgments reversed.*
*Verdicts set aside.*

Mr. Chief Justice Tauro participated in the deliberation on this case, but retired before the opinion was issued.