### Commonwealth *vs*. Victor Young.

Suffolk. October 7, 2011. - January 3, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & DUFFLY, JJ.

*Homicide. Practice, Criminal,* Argument by prosecutor, Instructions to jury, Capital case. *Defense of Others. Self-Defense. Malice.*

The evidence at a murder trial, which demonstrated that the defendant inflicted numerous blows on the victim in addition to the fatal blow, that the victim consciously suffered before his death, and that the defendant took pleasure in the victim's suffering and death, was sufficient to support a conviction of murder in the first degree on a theory of extreme atrocity and cruelty. [203-204]

At the trial of an indictment charging murder in the first degree on a theory of extreme atrocity or cruelty, the prosecutor's statement that the defendant "sliced" the victim "like an animal" was a permissible rhetorical tool and relevant to the crime charged, and was not designed to evoke an emotional response from the jury [204-205]; further, the prosecutor did not interject his personal opinion of the defendant's guilt by briefly using the first-person pronoun [205-206]; finally, one brief and isolated erroneous statement by the prosecutor did not create a substantial likelihood of a miscarriage of justice [206-207].

At a murder trial, the judge's instructions on defense of another, although not a model of clarity, would not, when taken as a whole, have confused a reasonable juror as to the law on the defense of another [207-211]; further, the judge's instructions on malice [211-212] and use of excessive force in defense of another [212-213] were not erroneous.

INDICTMENT found and returned in the Superior Court Department on November 10, 2003.

The case was tried before *Christine M. McEvoy*, J.

*Jeanne M. Kempthorne* for the defendant.

*Paul B. Linn*, Assistant District Attorney (*David J. Fredette*, Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant, Victor Young, was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. The conviction arose from an altercation in the early morning hours of September 14, 2003, on

Cambridge Street in Boston, during which the defendant fatally stabbed Waymond Pearson. The defendant also was convicted of assault with intent to kill, and assault and battery by means of a dangerous weapon, with respect to James Morgan.[1] On appeal, the defendant argues (1) the evidence was insufficient to support a conviction of murder on the theory of extreme atrocity or cruelty; (2) the prosecutor argued facts not in evidence and he appealed to the emotions of the jury; and (3) the trial judge's instructions to the jury on malice, defense of another, and the use of excessive, deadly force in defense of another were erroneous. We affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E, to reduce the murder verdict or order a new trial.

1. *Background.* The jury could have found the following facts. We reserve certain facts for our discussion of the issues raised. On the evening of September 13, 2003, a dispute arose between Calvin Goffigan and Jacqueline Badger over their child. Goffigan and Badger had been dating since 2001 and had lived together in an apartment at 250 Cambridge Street in Boston. In the summer of 2003, they began having difficulties. Badger ended the relationship and moved in with her family on Cape Cod. Despite the separation, the two took turns caring for the child and had an informal custody arrangement.

Around this time, Badger entered into an intimate relationship with the defendant. This relationship made Goffigan upset, and in late August and early September of 2003, he and Badger would often argue. Goffigan wanted to continue the relationship with Badger, but she did not want to see him.

The dispute reached a boiling point on the evening of September 13, 2003, a Saturday. That night Badger was at the house of a friend, Melissa Muller, in Sandwich. Also present were the defendant and his friend of many years, Jerry Dean Hall. The group played some card games and watched television. They had consumed alcohol, but no member of the group was intoxicated. That weekend, the child was with Goffigan in Boston pursuant to the couple's informal arrangement.

---

[1]The defendant does not challenge these convictions on appeal. The defendant was acquitted of assault and battery by means of a dangerous weapon on Leonard Gibson.

At approximately 11:30 P.M., as Muller was preparing to go to sleep,[2] she began receiving calls on her cellular telephone. On each occasion, the caller hung up. Eventually, Muller spoke to the caller — it was Goffigan. Goffigan asked for Badger. When Badger got on the telephone, Goffigan told her that she would never see her baby again. Badger relayed this to the defendant, and the defendant took the telephone. The defendant told Goffigan that the child was his, not Goffigan's. He also told Goffigan that he and Badger were about to have sexual intercourse when he called.

The group in Sandwich decided to go to Boston to retrieve the baby from Goffigan.[3] When Goffigan telephoned again, Badger and the defendant both told him they were going to Boston to retrieve the child. The group got into Muller's automobile and embarked on the trip to Boston. The defendant drove.

After hearing of the Sandwich group's trip to Boston, Goffigan met with some friends in the courtyard behind his apartment at 250 Cambridge Street: Terrell Williams, Leonard Gibson, James Morgan, Emmanuel Francois, and Waymond Pearson. Pearson was the child's godfather and knew both Badger and Goffigan well.[4] Pearson, Gibson, Morgan, and Francois had been drinking heavily, and they were intoxicated.[5] Goffigan told the group that his child's mother and "some dude" were coming to take his child, and that "we might need to beef tonight."[6] He asked his friends to wait with him in front of 250 Cambridge Street.

As the defendant, Badger, Muller, and Hall drove from Sandwich to Boston, there was a flurry of cellular telephone activity

---

[2]Muller was to sleep alone in her room, Badger and the defendant were to sleep together in an adjacent room, and Hall was to sleep alone in the living room.

[3]The baby was not due back with Badger until the following day, but after Goffigan's telephone calls and threat, a decision was made to retrieve the baby that night.

[4]All the parties were known to each other, except Hall and the defendant, who knew no one in the Boston group.

[5]Gibson testified that he drank "just about a gallon of vodka, along with a lot of beers."

[6]Williams testified that some members of the group were "trying to amp" each other up for a fight, and that the group agreed to fight. Francois testified that they only wanted to "make sure that nothing happen[ed]."

between them and the individuals in Boston. In one exchange, Goffigan told Badger that he was going to get all his friends to come meet them. Either Williams or Pearson called Badger and said, "You better have your burners because we're going to shoot you up," a message that she relayed to the others in the car. The defendant spoke to Goffigan, who threatened to "bring his gun out." The defendant's response was, "You don't have a fucking gun and you're from fucking downtown Boston and I'm from Orchard Park. In Orchard Park we live for blood." Badger disclosed that one caller had told her they "better be ready."

The defendant then asked Badger whether his fishing knife was in the car.[7] She replied that it was. The defendant asked for it, and he placed the knife on his lap.

They approached 250 Cambridge Street on the opposite side of the road from where Goffigan and his group were waiting. The defendant testified that from this position, he saw "a sidewalk full of people" standing in front of 250 Cambridge Street.[8] The defendant made a U-turn and double-parked.

Muller was the first to get out of the car; she called out for Goffigan to return the child. Morgan and others from Goffigan's group immediately approached the defendant as he left the vehicle. The defendant testified that they "started speed walking" toward him and told him, "Get the fuck out the car." He did not see any of the individuals holding weapons. The defendant held the fishing knife in his right hand.[9]

The defendant and Morgan exchanged blows with their fists.[10] The defendant testified that he was then hit from behind on the back of his head. He turned around to see two men, later identified to be Gibson and Francois. The defendant then swung at

---

[7]The knife was nine and one-half inches in total length, with a five-inch double-edge blade.

[8]A convenience store occupied the street level of 250 Cambridge Street. The defendant testified he saw about twenty people on the sidewalk in front of the building, but other than Morgan, Gibson, Francois, and Pearson, none of the other people on the sidewalk became involved in the fight.

[9]The defendant is right handed. He testified that he was holding the knife "[b]lade down."

[10]The defendant punched Morgan both with his right, knife-wielding hand, and with his empty left hand. He testified that, at this point, he did not cut Morgan.

Morgan with the knife, cutting him in the neck, abdomen, and shoulder.[11] The defendant testified that the men he was fighting then dispersed because he started "swinging wildly" to "get them away from me." He did not see Morgan and Gibson again that night.

The defendant next turned to see his friend Hall "getting beat down" by two men.[12] One of Hall's attackers, Francois, struck Hall once in the head and then backed away after realizing Pearson "had the situation handled." Hall and Pearson continued to fight each other. At that point, the defendant ran to the other side of the car, and in his own words, "I stabbed a guy that had his back turned to me." The person the defendant stabbed was Pearson. The defendant stabbed Pearson four times — twice in the back, once behind the left armpit, and once in the chest[13] — and also inflicted eight superficial "drag" cuts.[14]

The entire altercation was over within minutes.[15] The defendant and his group drove away, with Muller at the wheel. Pearson staggered about twenty to twenty-five feet in the direction of the Massachusetts General Hospital (hospital) before falling down in the middle of Cambridge Street. When Francois went to help him up, Pearson asked, "Why, dog, why?" About fifteen minutes later, an ambulance arrived and took Pearson to the hospital, where he was pronounced dead at 2:40 A.M.

---

[11]After being stabbed, Morgan returned to his apartment, then walked across the street to the Massachusetts General Hospital to be treated. Morgan's neck injury was still apparent at the time of trial in November, 2006.

[12]Initially, Hall had remained in the car. Hall testified that while he was sitting in the car, his door opened and he was "yanked out of the vehicle" by men who began kicking and punching him. The beating suffered by Hall was so severe that it caused him to vomit blood after the altercation.

[13]The medical examiner was unable to establish the order in which the wounds were inflicted. He testified that the wound to the chest entered Pearson's heart and "nicked" his lung; such a wound would be fatal within a short time. The wound to Pearson's right back "nick[ed]" his right lung; a person with such a wound would have "up to hours" to be treated. The other wound to the back, and the wound to the left armpit, were not deep enough to cause death.

[14]Pearson was shirtless at the time. At trial, medical testimony established that a superficial "drag" cut is one that barely pierces the skin, although such wounds may still require stitches.

[15]The two protagonists, Badger and Goffigan, did not participate in the fight. By the time of trial, they had had a second child together.

Muller drove to the Orchard Park neighborhood in the Roxbury section of Boston, where Hall lived. On the way, the defendant threw his knife out of the window onto the highway. Muller asked him, "What did you do, what did you do to my friends?" The defendant replied that his "heart doesn't pump like Kool-Aid."[16] He also stated that he hoped one of the individuals had died. On arriving in Orchard Park, before the group had learned of Pearson's death, the defendant said to Badger, "I had to do it for you." When the group later learned of Pearson's death via cellular telephone, the defendant suggested they "all move to the South."[17]

2. *Sufficiency of the evidence on extreme atrocity or cruelty.* The defendant contends that the evidence was insufficient to convict him of murder in the first degree on the theory of extreme atrocity or cruelty. His motion for a required finding of not guilty was denied. To convict a defendant of murder in the first degree on the theory of extreme atrocity or cruelty, the Commonwealth must prove three factors beyond a reasonable doubt: (1) the defendant committed an unlawful killing; (2) the killing was committed with malice; and (3) the killing was committed with extreme atrocity or cruelty. Model Jury Instructions on Homicide 11 (1999). The defendant challenges the sufficiency of the evidence as to the third element.

The factors a jury may use to support the third element were delineated in our decision in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-228 (1983). There, we said that the "factors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty . . . include [1] indifference to or taking pleasure in the victim's suffering, [2] consciousness and degree of suffering of the victim, [3] extent of physical injuries, [4] number of blows, [5] manner and force with which delivered, [6] instrument employed, and [7] disproportion between the means needed to cause death and those

---

[16]It is unclear what the defendant meant by this. Hall offered, "Just basically he ain't — he's not gonna let it lie down or is not going to take any mess."

[17]The defendant grew up in Orchard Park neighborhood of the Roxbury section of Boston, but lived in South Carolina for eight years from the age of fifteen to the age of twenty-three.

employed." *Id.* at 227. The jury need only find one of these factors to establish the third element of the crime. Model Jury Instructions, *supra* at 14.

Although there was evidence to support several factors, the Commonwealth's case focused largely on the fourth factor — number of blows. The Commonwealth presented evidence that the defendant stabbed Pearson four times and inflicted eight superficial "drag" cuts — a total of twelve wounds. The defendant argues that this number of wounds is insufficient to establish the fourth *Cunneen* factor. The argument apparently assumes that "drag" cuts should not be counted as "blows" for the purposes of the *Cunneen* analysis. But we have reviewed cases involving even a single blow, see *Commonwealth v. Anderson*, 445 Mass. 195, 200-201 (2005) (summarizing cases), and found no error in the jury's verdict of murder with extreme atrocity or cruelty. Where, as here, the defendant inflicted numerous blows in addition to the fatal blow, there was evidence of the victim's conscious suffering before his death, and there was evidence that the defendant took pleasure in the victim's suffering and death, we will not disturb the jury's verdict of murder with extreme atrocity or cruelty.

3. *Prosecutor's closing argument.* The defendant next argues that the prosecutor's closing argument was inflammatory, that it contained personal opinion, and that it misstated the evidence at trial. We agree with the third contention but conclude that the error did not give rise to a substantial likelihood of a miscarriage of justice.

The defendant first challenges a portion of the prosecutor's closing argument in which he stated that "[the defendant] saw his friend [Hall] behind the car and he went back and he proceeded to slice Waymond Pearson up like an animal." To the defendant, use of the phrase "like an animal" is an improper appeal to the jury's emotions.

Although it is error for a prosecutor to make an argument designed to evoke an emotional, rather than intellectual, response from the jury, "there is a distinction between a dramatic description in an argument and an argument designed to appeal to the jury's emotions." *Commonwealth v. Vuthy Seng*, 436 Mass. 537, 555 (2002), cert. denied, 537 U.S. 942, *S.C.*, 454 Mass.

490 (2010). Accord *Commonwealth* v. *Siny Van Tran*, 460 Mass. 535, 554 (2011). Moreover, where the crime charged is murder in the first degree on the theory of extreme atrocity or cruelty, the task of the jury is to serve as the conscience of the community and determine whether the killing merits that description. *Commonwealth* v. *Torres*, 437 Mass. 460, 464-465 (2002). Dramatic description from the prosecutor is more likely in such cases given the nature of the charge, and so long as the argument falls on the side of "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," *Commonwealth* v. *Costa*, 414 Mass. 618, 629 (1993), it is not grounds for reversal. See *Commonwealth* v. *Siny Van Tran*, *supra* (prosecutor's comment, "What [the witness] heard was the mass execution of five men. One of the worst and most violent days in the history of Boston," was permissible attempt to illustrate magnitude of crime charged, murder in first degree on theory of extreme atrocity or cruelty); *id.* at 554 n.24 (same for prosecutor's comment that five men were executed "like animals"); *Commonwealth* v. *Phillips*, 452 Mass. 617, 629-631 & n.10 (2008) (prosecutor's description of victim's disturbing injuries, suggestion of torture, and statement that "no one deserves to die that way" relevant to whether defendants acted with extreme atrocity or cruelty); *Commonwealth* v. *Johnson*, 429 Mass. 745, 749 (1999) (prosecutor's description of murder as "bloody massacre" permissible in extreme atrocity or cruelty case).

Here, in stating that the defendant "slice[d] Waymond Pearson up like an animal," the prosecutor was attempting to convey to the jury that this was more than an ordinary murder — it was "extreme as compared with ordinary means of producing death." *Commonwealth* v. *McGarty*, 323 Mass. 435, 440 (1948), quoting *Commonwealth* v. *Devlin*, 126 Mass. 253, 255 (1879). We conclude that this was a permissible rhetorical tool, relevant to the crime of murder in the first degree committed with extreme atrocity or cruelty, and was not designed to evoke an emotional response from the jury. The prosecutor's argument was not erroneous.

The defendant next charges error in the portion of the closing argument where the prosecutor stated, "And to be honest with you, I don't care how [the defendant] was holding the knife. I

don't care if the point was down, if the point was up; all I know [is] that the point of this knife plunged into Waymond Pearson's body four times and then cut him an additional eight times." According to the defendant, the prosecutor here committed two errors: his use of the pronoun "I" improperly injected his personal opinion into the proceedings; and his use of "and then" implied that the eight cuts occurred after the four stab wounds, a proposition that was not in evidence.

A prosecutor may argue forcefully for a conviction based on the evidence and on reasonable inferences drawn from the evidence. *Commonwealth* v. *Good*, 409 Mass. 612, 623 (1991), and cases cited. A prosecutor may not, however, misstate the evidence, refer to facts not in evidence, or interject his personal belief in the defendant's guilt. *Id.*

The prosecutor in this case did not interject his personal opinion of the defendant's guilt by briefly using the first-person pronoun. See *Commonwealth* v. *Mamay*, 407 Mass. 412, 424 (1990) ("The mere use of a first person pronoun does not interject personal belief into a statement"). At trial, the defendant testified in his own defense that when he got out of the automobile with the knife, he was holding the knife with the blade pointed down. He used a pen to demonstrate this for the jury. The defendant presumably presented this evidence so that the jury would believe he did not leave the car intending to kill. In the challenged statement, the prosecutor was attempting to diminish the significance of this testimony. The prosecutor essentially used "I don't care if" to mean "it doesn't matter if." Use of such a rhetorical device does not constitute an impermissible statement of personal belief; rather, it constitutes a permissible argument from the evidence presented.

The defendant's argument that the prosecutor's use of "and then" erroneously referred to facts not in evidence, i.e., the order of stab wounds, has some force. When the prosecutor stated that the defendant stabbed Pearson four times "and then" cut him "an additional" eight times, a reasonable juror may have been misled into thinking there was an established order of wounds. In reality, there was no such established order: during cross-examination, defense counsel repeatedly elicited

testimony from the medical examiner that he did not know the sequence in which the wounds were inflicted. Defense counsel apparently pursued this line of questioning so the jury would not think the defendant continued to stab the victim after inflicting the fatal blow, which could go to extreme atrocity or cruelty.

We do not believe, however, that this statement by the prosecutor created a substantial likelihood of a miscarriage of justice. The statement was brief and isolated, and more importantly, the prosecutor never argued that the order of wounds established extreme atrocity or cruelty. On the contrary, the prosecutor's argument focused on the number of stab wounds, the suffering of the victim, and the indifference of the defendant. The prosecutor's statement, though in error, did not create a substantial likelihood of a miscarriage of justice.

4. *Jury instructions.* The defendant argues that the judge's instructions on defense of another were incorrect and contradictory. The defendant further argues that the instructions erroneously suggested to the jury that (1) under the law of defense of another, the defendant could only use force to defend Hall if Hall, in retrospect, could have used force to defend himself; (2) the defendant's use of the knife established malice, and therefore manslaughter was unavailable; and (3) use of excessive force in defense of another requires a verdict of murder. The erroneous and contradictory nature of these instructions, the defendant argues, created a substantial likelihood of a miscarriage of justice in the jury's verdict and requires us either to reverse or reduce the verdict of murder in the first degree. We disagree.

We review the defendant's claims for a substantial likelihood of a miscarriage of justice, as they were not preserved at trial. See *Commonwealth* v. *Wright,* 411 Mass. 678, 681 (1992). When reviewing jury instructions, "[w]e evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words." *Commonwealth* v. *Trapp,* 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996). We do not consider bits and pieces of the instruction in isolation. See *Commonwealth* v. *Glacken,* 451 Mass. 163, 168-169 (2008), and cases cited.

a. *Instruction on defense of another.* The defendant first chal-

lenges an instruction[18] as having erroneously implied that the defendant could only use force to defend Hall if Hall, in retrospect, could have used such force. The defendant concedes that the judge's initial instruction on defense of another was correct, but the defendant asserts that this correct instruction was effectively negated by later incorrect instructions. Although the challenged portion of the instruction was not a model of clarity, and portions could be interpreted as erroneous, we conclude that the instructions taken as a whole would not have confused a reasonable juror as to the law on defense of another.

In *Commonwealth* v. *Martin*, 369 Mass. 640, 649 (1976) (*Martin*), this court stated the elements of defense of another:

> "An actor is justified in using force against another to protect a third person when (a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself."

The policy behind our recognition of the defense was to discourage indifference to the plight of strangers, an ill that had been

---

[18]The instruction reads as follows, with the challenged portions italicized:

"A person may lawfully use a dangerous weapon or deadly force in defense of a third person when a reasonable person in the actor's position would believe that such intervention was necessary for the protection of the third person, and in the circumstances as that reasonable person would believe them to be, the third person would have been justified in using a dangerous weapon or a deadly force to protect himself.

"So, in making that determination of whether the Commonwealth has proved an unlawful killing, it has to be without excuse; and in this case, the evidence raises the issue of defense of another. In order for the government to prove an unlawful killing, they must prove the defendant did not act in lawful defense of another, and *the law in self-defense applies to [Hall], whether he would have a right of self-defense; if he would have had a lawful right to self-defense . . . the government must prove that the defendant did not act in his lawful defense. So, you have to look to whether [Hall] has the right to self-defense* according to the instructions that I gave you, and then whether the Commonwealth has proven an unlawful killing without excuse and lawful defense of another." (Emphasis added.)

exposed in that era by the murder of Kitty Genovese in 1964. See *id.* at 648-649; *Commonwealth* v. *Monico*, 373 Mass. 298, 302, 303 (1977). See also 37 Who Saw Murder Didn't Call the Police, N.Y. Times, March 27, 1964, at A1.

Under clause (b) of the *Martin* formula, the circumstances must be viewed from the perspective of the intervening defendant, not of the third party. See *Martin, supra* at 649. Thus, whether the third party was, in retrospect, actually entitled to use self-defense is not a consideration.[19] This is not the rule in all States. One group of State courts holds that one who comes to the defense of another does so at his or her own risk: if the third person in retrospect would not have been permitted to use force, the intervening defendant is not permitted to claim defense of another. See, e.g., *Batson* v. *State*, 113 Nev. 669, 674 n.2 (1997) (defendant "could only rely on the privilege of defense of others to the extent that [his wife] could have invoked the privilege of self-defense"); *Leeper* v. *State*, 589 P.2d 379, 383 (Wyo. 1979) ("One asserting the justification of defense of another steps into the position of the person defended"). This is known as the "alter ego" rule. 2 W.R. LaFave, Substantive Criminal Law § 10.5(b) (2d ed. 2003).

A second group of State courts, including Massachusetts, holds that the intervening defendant need only reasonably believe that the third party is being unlawfully attacked; the question whether that belief was correct in retrospect does not enter the analysis. See, e.g., *Martin, supra* at 649-650; *State* v. *Fair*, 45 N.J. 77, 92-93 (1965). Here, then, it would make no difference whether Hall was entitled to use force in self-defense; the defendant need only reasonably believe that he was so entitled. Such a rule better comports with the policy of discouraging indifference to the plight of strangers. See *Commonwealth* v. *Monico, supra* at 303; *Martin, supra* at 648-649; *State* v. *Fair, supra* at 93.

---

[19]The distinction can make a great deal of difference, as illustrated in the following hypothetical:

> "*B* unlawfully attacks *C* and *C* defends himself in proper self-defense . . . . *A* arrives on the scene and, not knowing the true facts, reasonably concludes that *B* is the innocent victim of an unlawful attack by *C*; so *A* goes to *B*'s rescue and uses force against *C*."

2 W.R. LaFave, Substantive Criminal Law § 10.5(b), at 162 (2d ed. 2003).

Although the defendant is correct regarding the law of defense of another, he is not correct in asserting that a reasonable juror in this case would have been misled by the judge's instructions. The judge did not instruct the jury on the rejected "alter ego" rule. Rather, in discussing Hall's perspective, the judge appeared to be linking defense of another to the law of self-defense. The judge may have done so in response to the pronouncements of this court, and of the Model Jury Instructions on Homicide, that defense of another tracks the law of self-defense. See *Commonwealth* v. *Adams*, 458 Mass. 766, 774 (2011) ("Defense of another tracks, and is interwoven with, the elements of self-defense"); *Martin, supra* at 650 ("the trend . . . has been to interweave closely the justification of defense of a third person with self-defense"); Model Jury Instructions on Homicide 58 (1999) ("The defense of another instruction should mirror the self defense instruction"). Although the judge's formulation was somewhat confusing, we do not believe it created a substantial likelihood of a miscarriage of justice.

The balance of the instructions conveyed the proper law. In our prior decisions evaluating challenges to jury instructions, we have looked at whether the judge stated the correct standard in close proximity to the incorrect standard, see *Commonwealth* v. *Waite*, 422 Mass. 792, 806 (1996); whether the judge "repeatedly and clearly" emphasized the correct standard, *id.*; whether the judge compounded the error by giving the jury a written copy containing the incorrect instructions, or by repeating the incorrect instruction in response to a jury question, see *Commonwealth* v. *Little*, 431 Mass. 782, 787-789 (2000); whether the incorrect instructions were the last statements of law that the jury heard on a critical aspect of the case, see *Commonwealth* v. *Carlino*, 429 Mass. 692, 695 (1999); and whether the error was exacerbated by comments made by the prosecutor, *Commonwealth* v. *Azar*, 435 Mass. 675, 684 (2002).

Here, the challenged portion of the instructions came immediately after a correct statement of the law that tracked the Model Jury Instructions on Homicide, *supra*. Furthermore, at the end of her instructions, the judge again stated that defense of another applies "when under the circumstances . . . a reasonable person would believe the third person would have been

justified in using such force to protect himself." This was part of the last statement of law that the judge gave. Because the judge repeated the correct instruction, and the correct instruction was part of the last statement of law the jury heard, we conclude that, on the whole, a reasonable juror would not have misunderstood the law of defense of another.

We also note that in this case, even if the defendant is correct that a reasonable juror would have thought the defendant's right to defend Hall depended on Hall's actual right to defend himself, the error could not have given rise to a substantial likelihood of a miscarriage of justice where Hall's right to defend himself was never contested at trial. Essentially, the asserted error does not help the defendant. In his closing argument the prosecutor never suggested Hall could not resort to self-defense. Rather, the prosecutor argued that defense of another was unavailable because Pearson stopped fighting with Hall after being stabbed in the back. This argument was based in part on the defendant's own statement to the police, an audio recording of which was played for the jury, in which the defendant admitted that stabbing him once was enough to get Pearson away from Hall. It also was based on the fact that the stab wound most likely to cause death, the wound to the chest, was inflicted after Pearson had been stabbed in the back and had ceased fighting with Hall. Thus, the prosecutor's argument apparently conceded that Hall, who had been dragged from the car, had a right to self defense. A juror under the impression that the defendant's right to defend Hall depended on Hall's actual right to defend himself would have been more inclined, not less, to accept the defense.

b. *Instruction on malice.* The defendant next argues that an instruction on malice[20] essentially removed manslaughter as an option for the jury by stating that (1) malice may be inferred from the use of a dangerous weapon and (2) the knife used in this case is, as a matter of law, a dangerous weapon. Again, we disagree. The weapon used in this case, a nine-inch knife with a

---

[20]The challenged instruction reads:

"[W]hen I told you that as a general rule you are permitted to infer that a person who intentionally uses a dangerous weapon on another person is acting with malice, in this case I instruct you as a matter of law that [the defendant's knife] is a dangerous weapon."

five-inch double-edge blade, was a dangerous weapon. See, e.g., *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996) (no serious question as to malice where knife with six-inch blade used to stab victim in abdomen).

We have repeatedly approved of instructions that tell the jury they may, rather than they must, infer malice from use of a dangerous weapon. See *Commonwealth* v. *Tu Trinh*, 458 Mass. 776, 784-785 (2011), citing *Commonwealth* v. *Oliveira*, 445 Mass. 837, 842-845 (2006). We only require that the instruction make clear that the inference is permitted, rather than required. See *Commonwealth* v. *Oliveira*, *supra* at 843-845. Here, the judge stated that "as a general rule" the jury was "permitted to infer" malice from use of a dangerous weapon, not that they were required to so infer. The instruction was not erroneous.

c. *Instruction on excessive force in defense of another.* The defendant's final challenge to the jury instructions is that a portion[21] wrongly suggested that if the defendant used excessive force in coming to the defense of Hall, he may no longer claim defense of another and the killing is murder. The proper rule, of course, is that where excessive force is used in defense of another, the crime may be mitigated from murder to manslaughter. *Commonwealth* v. *Johnson*, 412 Mass. 368, 372-373 (1992). We do not agree with the defendant that the challenged instruction had the effect claimed. The judge explicitly referred to her earlier instructions on self-defense and warned the jury not to "look at this in a vacuum." The earlier instructions had stated, "If, however, the Commonwealth does prove excessive force in an effort to defend another, you would be justified in finding the

---

[21]The challenged instruction, given in response to a request by the prosecutor, stated:

"And in regard to my instructions to you on defense of another, a person may use force against another in order to protect a third person. Again, when a reasonable person in the defendant's position would believe that the use of force was necessary to protect the third person from imminent harm, then when under the circumstances that a reasonable person would believe the third person would have been justified in using such force to protect himself, I think I told you that. What I didn't say is the use of force in defending a third person may not be punitive, retaliatory or excessive. . . . But I also told you about excessive force, so don't look at this in a vacuum, but I did leave that sentence out. I apologize."

defendant guilty of voluntary manslaughter." We do not think the challenged instruction was erroneous, particularly given the express reference to the earlier instruction.[22]

5. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record of this case and conclude that there is no basis for reducing the defendant's degree of guilt or ordering a new trial.

*Judgments affirmed.*

---

[22]Because we hold that this instruction was not erroneous, we also reject the defendant's argument to the effect that a statement by the prosecutor compounded the purported error. There was no error to compound.