Commonwealth *vs.* Darryl Scott.

Suffolk. October 7, 2011. - October 22, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, & Duffly, JJ.

*Homicide. Assault with Intent to Kill. Assault by Means of a Dangerous Weapon. Firearms. Jury and Jurors. Evidence,* Prior conviction, Criminal records. *Criminal Records. Defense of Others. Practice, Criminal,* Capital case, Challenge to jurors, Argument by prosecutor, Instructions to jury, New trial, Assistance of counsel.

At a criminal trial, no violation of the defendant's rights under the Fourteenth Amendment to the United States Constitution or art. 12 of the Massachusetts Declaration of Rights to a fair and impartial jury arose from the judge's allowance of the prosecutor's peremptory challenge of an African-American juror, where several African-American jurors had been seated when the juror in question was challenged. [568-571]

At a criminal trial, the improper solicitation of testimony concerning the defendant's juvenile record did not prejudice the defendant, where the judge ordered the testimony struck immediately after it had been given. [571-573]

At a criminal trial, the prosecutor's comment in closing argument that the defendant's statement, "my life is over," was as good as a confession of guilt was a fair inference from the record; further, although some of the prosecutor's personal comments about defense counsel went beyond the bounds of proper argument, the comments were not focused on the character of the defendant or the evidence confronting him, and would have had little, if any, effect on the jury; finally, the prosecutor's suggestion that the evidence was strong was well supported. [573-575]

At a murder trial, the judge did not err in denying the defendant's request for an instruction on defense of another, where nothing in the evidence warranted a conclusion that a reasonable person would have believed that a third party was actually being attacked when the defendant fired his weapon. [575-577]

A Superior Court judge did not abuse his discretion in denying, without a hearing, the criminal defendant's motion for a new trial, in which the defendant alleged ineffective assistance of counsel, where a motion to suppress the defendant's statements would have been unsuccessful, and where the record did not support the defendant's allegation that counsel failed to pursue a defense. [577-579]

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or to order a new trial. [579-580]

Indictments found and returned in the Superior Court Department on April 3, 2003.

The cases were tried before *Charles T. Spurlock,* J.; a motion for a new trial, filed on September 2, 2008, was considered by him; and an amended motion for a new trial, filed on December 18, 2009, was heard by him.

*Alan Jay Black* for the defendant.

*Kathleen M. Celio,* Assistant District Attorney (*Edmond J. Zabin,* Assistant District Attorney, with her) for the Commonwealth.

DUFFLY, J. The defendant was convicted by a Superior Court jury of murder in the first degree in the shooting death of Nabil Essaid, armed assault with intent to kill Ahmed Obbada and Mohemmed Lebdoui, assault with a dangerous weapon on Boston municipal police Officer Matthew Clark, and various firearms offenses.[1] The defendant, who testified at trial, did not dispute that he shot Essaid; he maintained, however, that he acted in self-defense and in defense of his pregnant girl friend, as Essaid and his friends surrounded him and Obbada appeared to be reaching for a weapon in his waistband.

The denial of the defendant's motion for a new trial was consolidated with his direct appeal. The defendant alleges error in the judge's allowance of the peremptory challenge of an African-American juror; the admission of certain evidence concerning his juvenile record; portions of the prosecutor's closing argument; and the denial of his request for an instruction on defense of another. He asserts error also in the denial of his motion for a new trial, without an evidentiary hearing, in which he maintained that he had received ineffective assistance of trial counsel. Last, the defendant asks that we exercise our power under G. L. c. 278, § 33E, to grant him a new trial or to reduce the degree of guilt of the murder conviction. For the following reasons, we affirm the defendant's convictions and decline to grant him a new trial or to reduce the verdict to a lesser degree of guilt.

[1]The defendant was acquitted of armed assault by means of a dangerous weapon on Boston police Officers Brian Mannetta and Thomas Rose. His motion for required findings of not guilty was allowed as to one indictment charging armed assault with intent to murder and an indictment for resisting arrest. An indictment charging assault by means of a dangerous weapon on Nabil Essaid, the murder victim, was dismissed.

*Background.* Based on the evidence at trial, the jury could have found the following.

Essaid was shot on December 14, 2002, two weeks after he and several of his friends were involved in an altercation with the defendant and his friends. On December 1, the defendant and two of his friends, Andrew and Andre Kornegay, had had a confrontation with Essaid, Obbada, and Lebdoui, who claimed that the Kornegays had stolen their marijuana. The men were at Downtown Crossing in Boston when the Kornegays and the other three began arguing; the defendant ran over and intervened after he concluded that it was "getting heavy."

1. *Commonwealth's case.* Obbada was the Commonwealth's key witness to the events surrounding the shooting.[2] At approximately 6 P.M. as the defendant and his then girl friend, Victoria Fernandes, who was pregnant, were leaving a movie theater on Tremont Street in Boston, they saw Essaid, Obbada, and Lebdoui outside the theater.[3] The defendant told Fernandes to keep walking, which she did. He told the men to "[g]et the fuck out of here," and the three started to walk up Tremont Street. The defendant followed, giving "the impression of someone who is looking for a fight." When he was eight to ten feet from them, the defendant pulled out a nine millimeter Glock pistol (Glock) and fired at Obbada, who hid behind a car; one of the bullets hit his shoe. The defendant then fired at Lebdoui, who ran away, and, finally, the defendant fired several times at Essaid, who was hit by two bullets and fell to the ground. The defendant ran up Tremont Street toward the Park Street subway station. As he was running, his Red Sox baseball cap flew off his head. He turned around and ran back to pick it up, then continued running toward Park Street station.

Two female pedestrians on Tremont Street saw a man approach three teen-aged males outside the theater. One of the three said, "Don't bring that shit to me," and another said, "No,

---

[2]On the night of the shooting, Lebdoui was brought to Boston police headquarters to be interviewed; he ran from the station and was never located.

[3]Obbada said that the men were standing outside the theater, smoking and chatting, waiting for another friend who was inside the theater watching a movie; after that friend purchased his ticket, the others discovered that they did not have enough money to do so.

no, no, that's between you and him." The women kept walking, and, moments later, heard three "loud pops"; a man ran past them, dropped something, picked it up, and ran on. A male pedestrian also saw a man with a Red Sox hat running toward the Park Street station, coming from the location where a man was lying in the street, a few seconds after the pedestrian heard gunshots.

There were no leads in the shooting until February 6, 2003, when the defendant and two others (one was Andre Kornegay) were observed by undercover Boston police officers standing in front of a restaurant, looking up and down the street; Kornegay and the other man walked a slight distance away from the restaurant and apparently engaged in a drug transaction. The surveillance officers were directed to arrest Kornegay and to obtain identification from the defendant.[4] When officers approached the defendant, he ran, narrowly avoiding being hit by a passing automobile, and officers gave chase.

Several groups of officers from different divisions of the Boston police department were ultimately involved in the chase. Officer Thomas Rose testified that he became involved in the chase and attempted to tackle the defendant, but the defendant evaded him and Rose fell. While Rose was on the ground, the defendant pulled out his gun and pointed it at Rose, then turned and pointed it at Officer Matthew Clark, who had also joined in the chase. Clark pulled out his own firearm and ordered the defendant to drop his weapon; the defendant instead turned and ran. At some point, Officer Steven Sweeney saw the defendant trying to climb over a stockade fence.[5] When the defendant saw the officer, he turned and shot off one round, hitting nothing, then hid under a tarp, and was temporarily lost from the officer's sight. Officer Richard Kelley noticed a baseball cap on the ground near the tarp, and commented that "he's gotta be somewhere, his hat is right there." The defendant, who had heard the comment and did not want police to "plug [him] up," jumped out from under the tarp, holding a gun to his head and

---

[4]Kornegay was placed in custody, but escaped from the police cruiser.

[5]Rose also saw the defendant jump over a fence, and heard a gunshot "right in front" of him.

yelling, "Shoot me, shoot me, shoot me, kill me, kill me, kill me."

As officers surrounded the defendant, all with weapons drawn, the defendant said that he could not go to jail for a long time and that he would kill himself. As Rose was pointing his own weapon at the defendant's chest, the defendant was shouting, "Kill me, shoot me, I can't go to jail." Lieutenant Detective Stephen Meade, commander of the Boston police drug control unit and one of the officers who had been conducting the drug surveillance, testified that the defendant, who was very agitated and upset, said, "I'm not going to prison, I don't want to go to jail, I'm going to kill myself." Special operations officers were called to the scene. The defendant continued to point the gun at his head, crying and talking on a cellular telephone, saying that he could not serve a long time in jail, while police told him his sentence would not be longer than one year, because it was only a gun possession charge. Officer Martin O'Malley said that it was only a gun charge and the defendant had a good chance of "beating it." Kelley said, "You're not going to do any time in jail," and "How many of your friends do you know that have gone to jail for illegal possession of a handgun? None." The defendant said, "[N]one," then added, "[I]t's been used before."

Hostage negotiators were called in. The defendant was agitated, banging his head and repeating that he could not go to jail for a long time; when hostage negotiator Sergeant Matthew Kervin said it was only a year for a firearms charge, the defendant responded that he could not "do a year," and also told the officer, "You don't understand." Lieutenant Detective Robert Merner arrived at the scene and replaced Kervin as negotiator. The defendant was talking on his cellular telephone, sobbing and saying, "It's over, this is over, this is it," while continuing to hold the gun to his head. Merner told the defendant to put down the telephone and the defendant said, "You don't understand, my life is over, you don't understand," and "I hear them saying on the radio that I shot at a policeman." The defendant alternated between being extremely agitated and sobbing, then relaxing his hand on the trigger. At one point, approximately ten minutes into the standoff, the defendant said, "I'm tired," removed the gun from his right temple and pointed it in the air,

then switched to holding it with his left hand and pointing it at his left temple. When the defendant's father arrived at the scene, the defendant dropped the gun and surrendered.

A receipt for the purchase of the Glock in September, 2002, from a pawn shop in Arizona, was retrieved from the defendant during the booking process; the spent cartridge from the round that the defendant had fired near the fence was also recovered. Ballistics investigation showed that spent cartridge casings recovered from the area where Essaid was shot matched the defendant's Glock, and were fired from the same weapon.

Police then interviewed Obbada, who selected the defendant's photograph from a photographic array and said that the defendant had shot at him, Essaid, and Lebdoui. The male pedestrian identified the defendant's photograph as that of the man he had seen running on Tremont Street on the evening of December 14, 2002. Neither of the female pedestrians was able to identify the man she saw approach the three Middle Eastern men moments before the shots were fired.[6]

2. *The defendant's case.* Fernandes testified that, as she and the defendant left the theater, they saw three men of Middle Eastern descent leaning against a wall. The men said, "What up?" as though they knew the defendant and wanted to start "trouble," and then followed close behind the couple as they walked towards the Park Street subway station. The defendant told Fernandes to keep walking, and she did so. She heard three gunshots soon thereafter, and saw the defendant run past her toward the subway station. Fernandes boarded the train at Park Street. A few stops later, the defendant joined her in the subway car, and then returned to his apartment.

The defendant testified in his own defense. He said that, as they left the theater, he saw Essaid, Obbada, and another man he did not recognize, standing on a corner. Essaid said, "What up? Remember me?" and "What up, what up with that shit?" Essaid sounded as though he "wanted to come at" the defendant about Andre Kornegay's theft of their marijuana. The men followed them up Tremont Street, within five feet of him and

---

[6]One woman said that the defendant's photograph in the photographic array "stood out," but she was not able to make a positive identification of the man she saw moments before the shooting.

Fernandes, coming closer as he and Fernandes walked faster. Essaid was saying, "Come here, come here," and the men were speaking to each other in a language the defendant did not understand. The defendant became worried because Fernandes was pregnant and he "didn't want her to get hurt if something happened." He told Fernandes to "go home or keep walking," and she kept walking.

The defendant turned around with his back to Fernandes, and the three surrounded him, about five feet away. After he turned around, he did not see where Fernandes had gone. Essaid continued to repeat, "What's up with that shit, now, what's up with that shit, now." He saw Obbada holding his waist, reaching into his waist and "throwing gang signs." Thinking Obbada was reaching for a gun, the defendant put his hand on his own waist (the Glock was in a holster at his waist), saying "Chill, chill. That's between you and [Andre Kornegay]." Essaid kept coming closer, so the defendant pulled out his own weapon; he wanted "to show them that I had a gun." Seeing the gun, the other man stopped, but Obbada came closer, reaching into his waist. The defendant thought Obbada was about to pull out a weapon, and pulled the slide to chamber a bullet in his Glock. Obbada was arm's length and reaching for something in his waist area, and Essaid was closer; the defendant fired a warning shot into the ground. Then Essaid, who was at his side, lunged at the defendant, as though Essaid were going to grab his arm; the defendant squeezed the trigger, then turned and ran. He did not know at the time how many shots he fired, "[i]t just happened so quick," and only found out the next day, through news reports, that someone had been killed. The defendant said he was focused both on Obbada, whom he believed had a weapon, and on his fear that Essaid would grab the Glock from his hand and shoot "my baby's mother." He wanted to make sure Fernandes got away "before anything happened."

The defendant ran toward Park Street, not seeing Fernandes. He knew where Fernandes was going, and, wanting to catch up with her, he went to a closer subway station and got on a Red Line train there.[7] He found Fernandes at Andrew Station, where they boarded another train in order to get to Ashmont Station.

---

[7] The defendant testified that he went to the Chinatown subway station, then

The defendant testified also that he was with the Kornegays on the night of February 6, 2003, drinking in the restaurant bar. He came out of the bar and was standing outside the restaurant when police approached saying, "You come here," and he began to walk away. An officer followed, saying, "Don't make me chase you," and then began running toward the defendant, who "just took off." The officer tripped and fell. The defendant kept running, then tried to hide. A police cruiser came by, shining its light in his direction, and he started running again. The defendant, who always carried the Glock with him, eventually pulled the Glock out of his pocket and was holding it in his hand, not pointed at anyone, while he was running. The gun went off accidentally, when he landed on his back after he jumped over a fence; the shot went into the air.

The defendant did not shoot at any officers; if he had, he said, "I would be dead right now." He hid under a tarp, but abandoned his efforts to hide when he heard police radio reports that the suspect had fired at an officer, and he thought that the officer who had seen his hat and was coming closer might have seen him. He put the gun to his head and came out from under the tarp "before they could plug me up"; his father, with whom he had been speaking on his cellular telephone, had told him not to throw the gun out from under the tarp, to point the gun toward himself so that police would not shoot, and that his father was on his way there. He did not remember making any statements to the officers except that he could not go to jail; if he said anything else, he did not remember it. The defendant dropped the gun when his father arrived.

*Discussion.* 1. *Peremptory challenge of African-American juror.* The defendant, who is African-American, maintains that a new trial is required because, in a case involving a victim of Middle Eastern descent, the judge allowed the prosecutor's peremptory challenge of an African-American juror, after the prosecutor had challenged several previous jurors of color, without making a determination that the prosecutor had a race-

---

clarified that he went "to Chinatown" and "crossed under the tunnels" to get "on the Red Line to Andrew." The Chinatown station is on the Orange Line, but the nearby Downtown Crossing station serves both the Orange and Red Line trains, with walkways that permit riders to cross between the lines.

neutral reason for his challenge. The defendant maintains that the decision to allow this challenge violated his rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to a fair and impartial jury. See *Commonwealth* v. *Soares,* 377 Mass. 461, 480, 486-488, cert. denied, 444 U.S. 881 (1979) (right to trial by jury drawn from "representative cross section of the community," assuring a "diffused impartiality," is critical, and prosecutors may not use peremptory challenges "to exclude prospective jurors solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community").

On the first day of jury selection, the prosecutor sought to exercise, over objection, a peremptory challenge against juror no. 5-16. The prosecutor indicated his reason for the challenge was that the juror had an upcoming job interview within the next week and was anticipating the birth of his child within the next month. Noting that juror no. 5-16 was "one of the few black males in this room," the judge ordered the juror be seated.

On the second day of jury selection, the prosecutor sought to challenge juror no. 10-10. Defense counsel objected, stating that the juror was "a black female" and that "this is the third or fourth person of color, the fourth person of color the Commonwealth has challenged." The judge responded: "One I didn't allow. The others, there were neutral reasons for them. In this county, they challenge everybody under twenty-five, thirty, whatever." He then proceeded to ask the prosecutor, "What was your reason?" The prosecutor replied that there were a "number of women of color" who were not challenged, and who had been seated, and that there was no pattern. The prosecutor acknowledged that he "understood" the judge's ruling the previous day on juror no. 5-16, because he was a male. Over the defendant's objection, the judge ruled, "All right, it's allowed."

The prosecutor then sought to exercise a peremptory challenge against juror no. 11-10, over the defendant's objection that the juror was "a Hispanic female, member of the minority community." The prosecutor responded again that "there is no pattern," but explained further that the juror was employed at a school where a man that he was prosecuting for murder had previously worked, and that the man had had many friends at

the school. After questioning by the judge revealed that the juror did not know the man, the prosecutor withdrew his challenge and the juror was seated.

Peremptory challenges are presumed to be proper. *Commonwealth* v. *Maldonado*, 439 Mass. 460, 463 (2003). That presumption may be rebutted, however, by showing that "(1) there is a pattern of excluding members of a discrete group and (2) it is likely that individuals are being excluded solely on the basis of their membership" in that group. *Id.*, quoting *Commonwealth* v. *Garrey*, 436 Mass. 422, 428 (2002).

When the question of an improper use of a peremptory challenge is raised, the judge must make an initial finding as to whether the opposing party has made a prima facie showing that the use was improper. *Commonwealth* v. *Maldonado, supra*, citing *Commonwealth* v. *Burnett*, 418 Mass. 769, 771 (1994). If the judge concludes that the opposing party has established a prima facie case that the use was for a discriminatory purpose, the burden shifts to the party seeking to exercise the challenge to provide a "group-neutral" explanation for that challenge. The judge must then determine whether the reason provided is "bona fide" or a "sham" offered to avoid admitting to group discrimination. See *Commonwealth* v. *Maldonado, supra* at 463-464, and cases cited. A determination whether the explanation offered is adequate to establish a permissible, nondiscriminatory basis for the challenge is within the sound discretion of the judge, and will not be disturbed so long as there is support for the ruling in the record. *Commonwealth* v. *LeClair*, 429 Mass. 313, 323 (1999).

Because there may be few members of the allegedly targeted group among the venire at the point at which the peremptory challenge is questioned, a challenge to "a single prospective juror within a protected class could, in some circumstances, constitute a prima facie case of impropriety." *Commonwealth* v. *Fryar*, 414 Mass. 732, 738 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997).

As the defendant asserts, in some circumstances, by requiring a prosecutor to provide an explanation for making a peremptory challenge, a judge may have implicitly found that a defendant has made a prima facie showing that the challenge was improper.

See *Commonwealth* v. *Calderon*, 431 Mass. 21, 25-26 (2000). However, "[w]here a venire contains 'a paucity of African Americans' a judge 'has broad discretion to require an explanation without having to make the determination that a pattern of improper exclusion exists.' " *Commonwealth* v. *Van Winkle*, 443 Mass. 230, 236 (2005), quoting *Commonwealth* v. *Garrey*, 436 Mass. 422, 429 (2002).

Here, the defendant argues that, by asking the prosecutor to state his reasons, the judge made an implicit finding that the prosecutor's challenge to juror no. 10-10 was racially motivated, and then offered, sua sponte and improperly, a race-neutral, but also impermissible, reason for the prosecutor's challenge. The record, however, is to the contrary. The judge's comment that "in this county they challenge everybody under twenty-five" was made before he asked the prosecutor for a reason, and after the judge had pointed out that either there had been race-neutral reasons for earlier peremptory challenges, or that, in one instance, he had rejected the challenge and seated the male African-American juror. By not requiring the prosecutor to provide a reason for the challenge after his initial statement that there was no pattern of discrimination, the judge plainly accepted the prosecutor's assertion, unchallenged by the defendant, that a number of African-American women (as was juror no. 10-10) had been seated without challenge on the previous day, and that there was no pattern of discrimination, thus concluding that the defendant had not met his burden of establishing a prima facie case. Indeed, the judge stated explicitly, in response to the prosecutor's mention of the already seated African-American jurors, "All right, it's allowed."

Because the defendant did not dispute the prosecutor's assertion, with which the judge apparently agreed, that at least three African-American jurors had been seated when juror no. 10-10 was challenged, we cannot say, on this record, that the judge abused his discretion in allowing the peremptory challenge of juror no. 10-10, or that the jury did not represent a "cross section of the community."

2. *The defendant's juvenile record.* The defendant maintains that evidence of his juvenile record was introduced improperly, after the prosecutor had stated, in response to the defendant's

motion to exclude his juvenile record, that he did not intend to introduce it, and the defendant did not thereafter pursue argument on the motion. The defendant claims further that the prosecutor solicited testimony concerning the defendant's juvenile record well aware that he did not have, and had not sought to obtain, a certified copy of the adjudication of delinquency. We conclude that, while the testimony was improper, there was no prejudicial error, because the judge ordered the testimony struck immediately after it was given, once he became aware that the prosecutor did not have the certified copy of the record.

Prior to trial, the defendant had moved to exclude evidence of his juvenile adjudication of rape; the prosecutor asserted that he did not intend to introduce that adjudication and the judge ruled it would be excluded unless the defendant made it an issue at trial. The defendant testified that he had purchased legally a "Glock 23" firearm at a pawn shop when he was living in Arizona. He said that, to do so, he had been required to complete a form indicating that he had no criminal convictions. The judge, sua sponte, interrupted the defendant's testimony and, at sidebar, noted that he was concerned the defendant had just testified that he did not have a criminal record. Defense counsel stated that the defendant had only a juvenile record, and that the record should not be introduced. The judge reserved ruling on the issue.

On cross-examination, the prosecutor asked the defendant, over objection, whether he had disclosed his prior "convictions" when he completed the application for the gun permit, and whether he had completed the application truthfully. The defendant responded that he had a juvenile case that he believed was continued without a finding, he served a term of probation and the charges were dismissed, and that he did not think that it had to be disclosed in response to the question whether he had any criminal convictions. He stated also that, if he had been convicted of a felony, he would not have received the firearm permit. At sidebar, the prosecutor acknowledged that he had no certified copy of the defendant's juvenile adjudication, but said that he could try to obtain one; the judge ordered that the discussion of any testimony about the Juvenile Court be struck.

"Evidence of prior convictions . . . may be admitted to rebut specific portions of the defendant's testimony." *Commonwealth* v. *Roderick*, 429 Mass. 271, 274 (1999). While the prosecutor had agreed not to introduce the defendant's juvenile record, the defendant himself opened the door to this evidence by stating, without provocation, and apparently not in response to defense counsel's question, that he had no criminal convictions. Nonetheless, the prosecutor should not have cross-examined the defendant, repeatedly, and over repeated objection, with questions that evidently would require responses about the defendant's juvenile record, knowing that he did not have, indeed had not tried to obtain, the necessary certified copies of the record to introduce at trial. See generally *Commonwealth* v. *Saunders*, 50 Mass. App. Ct. 865, 868-869 (2001).

However, there was no prejudice to the defendant. The judge immediately took corrective action, instructing the jury that any discussion of anything that had happened in the Juvenile Court was struck from the record and they were not to consider it. Additionally, what the jury had heard by the defendant's statements, before they were struck, was that he had served some time on probation for an unspecified minor crime as a juvenile, that he had not committed any felonies, and had been deemed responsible enough by the State of Arizona to legally purchase a firearm. In the circumstances of the shooting death of one victim and shootings at multiple other people, including several police officers, information that the defendant had been on probation as a juvenile, for an offense that did not warrant incarceration and that was subsequently dismissed, would have had but little impact on the jury.

3. *Prosecutor's closing argument.* The defendant maintains that the prosecutor's closing argument was improper in a number of respects. At trial, the defendant objected on each ground, and also sought a mistrial based on these asserted improprieties, which was denied.

The prosecutor argued in closing that the defendant's statement, "my life is over," when holding the gun to his head, was

"as good as a confession of guilt. That is what he said when confronted by police, those were his words. 'My life

is over.' His life was over because he knew he had been caught, he knew he had been cornered."

The defendant maintains that this argument was impermissible and not a fair inference from the record. We disagree. Although the evidence would have supported a conclusion that the defendant was referring to the statements that he had heard on the police radio alleging that the suspect had shot at a police officer, the jury could reasonably infer from the evidence that the defendant made the statements because he knew that the Glock in his hand was the one used in the shooting of Essaid, and that police would inevitably discover the connection.

The defendant contends also that the prosecutor made a number of personal attacks on defense counsel. He referred to defense counsel as a "Monday morning quarterback," emphasizing that counsel did not know anything about the Boston police "Code 99" (a hostage situation) that had been ordered after the defendant pointed the gun to his own head, and did not know anything about how to conduct a homicide investigation: "[f]or all the volume he brings to this argument, [he] has no special knowledge here. He knows no more about how to run a homicide investigation than any of you do."

While a prosecutor is entitled to argue "forcefully for a conviction," *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2003), quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987), and while "enthusiastic rhetoric . . . and excusable hyperbole" do not require reversal, *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998), quoting *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997), some of the prosecutor's personal comments about defense counsel went beyond the bounds of proper argument. They were not, as the Commonwealth maintains, appropriate responses to defense counsel's closing argument, in which he questioned the adequacy of the police investigation. Nonetheless, the comments were focused on the defendant's counsel and not on the character of the defendant or the evidence confronting him, and would have had little, if any, effect on the jury. See *Commonwealth* v. *Mitchell*, 428 Mass. 852, 857 (1999) (jury presumed to recognize that "prosecutor is an advocate").

Last, the defendant claims that in describing the Com-

monwealth's burden of proof, the prosecutor said, "It is a burden of proof that I will gladly shoulder, with evidence like this," thereby shifting the burden of proof to the defendant. The prosecutor's comment, however, was made at the end of a lengthy and accurate discussion on the heavy burden of proof that the Commonwealth was required to meet. In that context, and given the testimony from an eyewitness to the shooting who was only a few feet away, plus the testimony of a number of police officers as to the defendant's actions on the evening of February 6, 2003, the prosecutor's suggestion that the evidence was strong is well supported.

The judge repeatedly and emphatically, both before closing argument and in his final charge, explained to the jury that closing arguments are not evidence, that they are only the opinion of the attorneys, and that the jury should, in every instance, rely on their own recollection of the evidence and not on anything the attorneys may have argued. The judge instructed also that

> "counsels' role here is to try the case, not to give opinions and not to interject themselves into the process, so if you think anyone has done that or feel anyone has done that, disregard that altogether. It's only the evidence that you heard or the testimony that you heard from the witnesses on the stand and the items that were admitted as evidence that you must consider in this case."

We conclude that, although some of the prosecutor's statements may have exceeded the bounds of permissible argument, they were unlikely to have affected the jury's verdicts. See *Commonwealth* v. *Barros*, 425 Mass. 572, 582 (1997). There was no prejudicial error.

4. *Instruction on defense of another.* The defendant argues that the judge's denial of his motion for an instruction on defense of another, later renewed, was error. He maintains that he believed he had to shoot Essaid, Obbada, and Lebdoui to protect Fernandes, his "baby's mother," because he feared that they were going to take his gun and shoot her or otherwise harm her, possibly with their own weapons.

The defendant requested, and received, an instruction on self-defense, with the judge instructing that, where a person is under

a mistaken belief that deadly force is necessary, he may still use deadly force in self-defense if the belief is reasonable in the circumstances. The judge also instructed on the excessive use of force in self-defense, and on reasonable provocation, which negate the element of malice, mitigating murder to manslaughter. See, e.g., *Commonwealth* v. *Whitman*, 430 Mass. 746, 755-756 (2000); *Commonwealth* v. *Johnson*, 412 Mass 368, 373 (1992); *Commonwealth* v. *Burbank*, 388 Mass. 789, 795 (1983).

In declining, over objection, to give the instruction on defense of another, the judge observed, "[Fernandes] is long gone. . . . She was gone and there is no evidence whatsoever they were after her."

An individual is entitled to use force to protect a third person if "(a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself." *Commonwealth* v. *Young*, 461 Mass. 198, 208 (2012), quoting *Commonwealth* v. *Martin*, 369 Mass. 640, 649 (1976). "The reasonableness of the belief may depend in part on the relationships among the persons involved." *Commonwealth* v. *Martin, supra*. The reasonableness of the belief is from the point of view of the actor and not of the third party, such that whether the third party was actually entitled to use self-defense, or believed the use of force to be necessary, is not at issue. See *Commonwealth* v. *Young, supra* at 209. The actor "need only reasonably believe that the third party is being unlawfully attacked," even if, in retrospect, that belief was incorrect. *Id.* "The actor's justification is lost if he uses excessive force, e.g., aggressive or deadly force unwarranted for the protective purpose." *Commonwealth* v. *Martin, supra.*

There was no error in the judge's conclusion that the defendant was not entitled to an instruction on the use of force in defense of another. Nothing in the evidence warrants a conclusion that a reasonable person would have believed Fernandes was actually being attacked when the defendant pulled the trigger. At that point, by his own testimony, Fernandes had walked on, as he told her to do, the defendant could no longer see her, and

he did not know where she had gone. Viewing the evidence in the light most favorable to the defendant, the three men were focused on, and surrounding, the defendant, challenging him about Andre Kornegay's theft of their marijuana. The men were not following or threatening Fernandes, who would not have been entitled to use deadly force in her own defense. See *Commonwealth* v. *Adams*, 458 Mass. 766, 775 (2011).

In any event, an instruction on defense of another would have been of no assistance to the defendant and would not have affected the verdict. The jury rejected the defendant's assertions that he acted in self-defense, with the men only a few feet from him; concluding that the defendant did not act to defend himself when he squeezed the trigger, whether reasonably or not, the jury could not have concluded that the defendant acted to defend Fernandes, who was not in sight at that point.

5. *Denial of motion for a new trial.* The defendant filed a motion for a new trial on the ground of ineffective assistance of counsel. He maintained that counsel was ineffective in failing to investigate, prepare, and present an adequate defense, specifically in failing to move to suppress as involuntary the defendant's statements to officers on February 6, 2003. The defendant contends that the judge, who was also the trial judge, erred in denying his motion for a new trial without conducting an evidentiary hearing, and in concluding that counsel was not ineffective for failing to seek to have the defendant's statements suppressed as involuntary.

Whether to grant a motion for a new trial rests within the sound discretion of the judge, and will not be reversed unless "manifestly unjust" or if the trial was "infected with prejudicial constitutional error." *Commonwealth* v. *Espada*, 450 Mass. 687, 697 (2008), quoting *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999). Because the motion judge was also the trial judge, he is entitled to particular deference. See *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004). Since we discern no error in the course of the trial that would have been "likely to have influenced the jury's conclusion," *Commonwealth* v. *Mercado*, 452 Mass. 662, 666 (2008), quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992), the judge did not err in denying the defendant's motion for a new trial.

Nothing in the record suggests that the defendant's statements were not voluntarily made, or that he was so overwrought that they were not the product of a rational intellect or made of his free will. The statements were initiated by the defendant when he jumped out from under the tarp and spontaneously started speaking, and continued almost exclusively in the absence of any questions by police. See *Commonwealth* v. *Braley,* 449 Mass. 316, 325 (2007). The defendant was not being questioned about any crime. Police were unaware that the defendant had any involvement in an earlier shooting, and asked him nothing about that crime. The questions they did ask — "How many of your friends do you know have gone to jail for illegal possession of a handgun?" — were focused only on getting the defendant to put down his weapon. Moreover, those few questions were rhetorical and answered, in one instance, by the officer who posed the question.

The defendant's actions demonstrate a rational intellect and an ability to make reasoned decisions throughout the confrontation with police on February 6, 2003. The defendant himself testified that he pointed the gun to his head after calling his father on his cellular telephone to ask for advice, and being told that he should point the gun at himself to avoid being killed by police. The defendant never pointed the gun at any of the officers surrounding him, and dropped it immediately when his father arrived. In the midst of the standoff, the defendant, saying that he was tired, switched the gun to his other hand, being careful to keep it pointed away from the officers.

Counsel was not ineffective for failing to file a motion to suppress statements that would have been unsuccessful. The expert that the defendant ultimately obtained, in conjunction with his motion for a new trial, concluded only that the defendant might have been in an "exacerbated state of his depression" at the time of the chase. That, alone, would not have rendered his statements involuntary. See *Commonwealth* v. *Auclair,* 444 Mass. 348, 355 (2005) ("emotional upset alone does not render" statement involuntary "where there is no evidence that the defendant was acting irrationally"); *Commonwealth* v. *Stroyny,* 435 Mass. 635, 646-647 (2002) ("distress, even profound distress, does not necessarily mean that a defendant is incapable of

withholding any information he conveys"); *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 555 (2001), and cases cited (that defendant "may have been in a disturbed emotional state, or even suicidal, does not automatically make statements involuntary").

The record does not support, as the defendant alleges, that his trial counsel failed to pursue a defense. Trial counsel moved to suppress the identification of the defendant from photographic arrays on the ground that they were unnecessarily suggestive, and to suppress all of the firearm evidence — the gun, ammunition, and spent cartridges — recovered on February 6, 2003, after the foot chase. A lengthy voir dire examination of the police officers was conducted in conjunction with that motion, which was denied. Counsel cross-examined the officers in detail on what they were able to see of the defendant and whether he had a gun, thereby pointing out to the jury that many of the officers did not see a gun in the defendant's hand. He argued extensively in closing that the police investigation was inadequate, and that the differing statements by the officers as to whether the defendant had a gun, and what they reported he said, showed both the inadequacy of the investigation and that the officers were not being forthright in their testimony. He emphasized the differences in the testimony about the defendant's statements to support the argument that the defendant had not made, or did not remember making, most of the statements.

We discern no abuse of discretion in the judge's decision to deny the defendant's motion for a new trial.

6. *Review pursuant to G. L. c. 278, § 33E.* Having carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to reduce the murder verdict or to order a new trial. While the defendant's evidence, if believed, might have supported a determination that the defendant used excessive force in self-defense, resulting in a verdict of manslaughter, the jury were not required to believe this evidence. The testimony that the defendant followed Obbada, Essaid, and Lebdoui, as though he were "looking for a fight," while the men kept walking, and then pulled out a gun and fired at each unarmed man in turn, as the men tried to flee, is consonant with

a verdict of murder in the first degree on a theory of deliberate premeditation.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*