APPEALS COURT 
 
 COMMONWEALTH vs. ERIN KIPEUM LEE

 
 Docket:
 23-P-496
 
 
 Dates:
 December 14, 2023 - September 23, 2024
 
 
 Present:
 Hand, Hershfang, & Brennan, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Larceny. Money Laundering. Jury and Jurors. Practice, Criminal, Jury and jurors, Empanelment of jury, Challenge to jurors, Instructions to jury. Statute, Construction. Evidence, Intent, Expert opinion. Witness, Expert.
 
 

  
      Indictments found and returned in the Superior Court Department on January 31, 2019.
      The cases were tried before Janice W. Howe, J.
      Andrew P. Power for the defendant.
      Christa Elliott, Assistant District Attorney, for the Commonwealth.
      HERSHFANG, J.  After the defendant house- and cat-sat for her landlord for three and one-half months, during which time the landlord's bank account was depleted and many of the landlord's checks negotiated, a grand jury indicted the defendant on two counts of larceny over $250 from a person aged sixty or older, one based on credit card use and one on check use, G. L. c. 266, § 30 (5), and single counts of uttering, G. L. c. 267, § 5, forgery, G. L. c. 267, § 1, and money laundering, G. L. c. 267A, § 2.  A jury convicted the defendant of one larceny count (credit cards) and of money laundering.[1]  The judge denied the defendant's posttrial motion for a required finding of not guilty on the money laundering charge.
      This appeal challenges the trial judge's allowance of the Commonwealth's peremptory strike of an Asian-American juror; contests the sufficiency of the evidence and a jury instruction for the larceny conviction; and takes issue with two aspects of the money laundering conviction.  We affirm the larceny conviction and reverse the money laundering conviction.
      Background.  The defendant was the victim's tenant; they both lived in the same building.  In December 2017, the victim, then seventy-seven years old, went to Brazil (where she owns properties) for three and one-half months, relying on the defendant to care for the victim's cats.  The victim left the defendant keys to the victim's apartment; only the defendant had the apartment keys.  The victim also left the defendant a check for $5,000 to cover the cost of any emergency snow removal.  The victim left unused checks and two credit cards in her apartment; these were hidden in a drawer under a pile of documents.  A bulletin board in her apartment displayed the victim's email address and various passwords. 
      When the victim returned from Brazil, she went to her bank and learned that her bank account was empty; the last $25,000 of what had been a $100,000 balance had been withdrawn by check the prior day.  The signatures on the checks withdrawing these funds were not the victim's.  When the victim went to a grocery store, her American Express card was declined despite its having a $10,000 limit.  The victim had not taken this card to Brazil with her nor used it while away.
      The victim reported the losses to the police.  The resulting investigation revealed that the checks drawn on the victim's account had been deposited in a Bank of America account in the defendant's name.  Video surveillance footage and records from various automated teller machines showed the defendant depositing the victim's checks.  The defendant's bank records evidenced these deposits.  The records also revealed transfers to the defendant's family members in South Korea and Canada, including one with a note, "[H]appy birthday POP Family support," another with a note, "Family support," and another that noted, "Flight tickets POP Family Support."  
      During her absence in Brazil, the victim's American Express card was used to make purchases in the "tens of thousands" of dollars.  A search of the defendant's apartment revealed numerous packages containing items that had been charged on the victim's American Express card or to a Discover account that had been opened in her name during her absence.  The police also recovered many gift cards, most made out to the defendant, some of which bore memos that appeared to be from others (a law firm, the victim, or the defendant's parents).[2]  
      Discussion.  1.  Jury empanelment.  Over objection of the defendant, who is Asian, the Commonwealth was permitted to exercise a peremptory challenge to strike an Asian-American juror.  The defendant maintains that this was error under the Batson-Soares framework.  See Batson v. Kentucky, 476 U.S. 79 (1986); Commonwealth v. Soares, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979), overruled in part by Commonwealth v. Sanchez, 485 Mass. 491, 511 (2020).  In particular, she claims that the prosecutor's proffered reason for her peremptory strike of the juror was not credible and therefore inadequate to support the judge's determination that the prosecutor had given an "adequate and genuine reason" for the strike.  See Sanchez, 485 Mass. at 493.  We are not persuaded.
      "We generally presume that peremptory challenges are made and used properly during jury selection."  Commonwealth v. Mason, 485 Mass. 520, 529 (2020).  This presumption is rebuttable if "the totality of the relevant facts gives rise to an inference of discriminatory purpose" (citation omitted).  Sanchez, 485 Mass. at 511.
      "A trial judge is strongly encouraged to ask for an explanation as questions are raised regarding the appropriateness of the challenges. . . . A judge has the broad discretion to do so 'without having to make the determination that a pattern of improper exclusion exists.'"  Commonwealth v. Lopes, 478 Mass. 593, 598 (2018), quoting Commonwealth v. Issa, 466 Mass. 1, 11 n.14 (2013).  If a court undertakes this inquiry, 
"the party attempting to exercise a peremptory challenge bears the burden of providing a 'group-neutral' reason for the challenge.  Commonwealth v. Scott, 463 Mass. 561, 570 (2012).  Finally, the judge then evaluates whether the proffered reason is 'adequate' and 'genuine.'  Commonwealth v. Maldonado, 439 Mass. 460, 464 (2003)[, abrogated by Commonwealth v. Robertson, 480 Mass. 383, 396 n. 10 (2018)].  Only if it is both may the peremptory be allowed."
Commonwealth v. Robertson, 480 Mass. 383, 390-391 (2018). 
      "An explanation is adequate if it is clear and reasonably specific, personal to the juror and not based on the juror's group affiliation (in this case race), and related to the particular case being tried" (citations and quotations omitted).  Maldonado, 439 Mass. at 464-465.  "An explanation is genuine if it is in fact the reason for the exercise of the challenge. . . .  An explanation that is perfectly reasonable in the abstract must be rejected if the judge does not believe that it reflects the challenging party's actual thinking" (citation omitted).  Id. at 465. 
      "This court reviews a trial judge's decision to allow a juror to be struck through the use of a peremptory challenge for an abuse of discretion" (citation omitted).  Commonwealth v. Rosa-Roman, 485 Mass. 617, 637 (2020).  We remain mindful that "the judge was in a position to evaluate both the prosecutor and the juror's demeanor" (citation omitted), id. at 638, and that "[r]estraint, in the review of fact finding, is fundamental to an appellate judge's role."  Commonwealth v. Kalila, 103 Mass. App. Ct. 582, 590 (2023).  "We grant deference to a judge's ruling on whether a permissible ground for the peremptory challenge has been shown and will not disturb it so long as it is supported by the record" (citation omitted).  Commonwealth v. Prunty, 462 Mass. 295, 304 (2012).  
      The juror at issue was juror no. 23.  In response to the question, "The defendant and the alleged victim are of different racial or ethnic groups.  Would that make it hard for you to be fair and keep an open mind in this case?" she said, "Could be."  Asked to explain, juror no. 23 responded, "Because I'm Asian-American, so I may have some bias against certain people."  She noted that "recently there are a lot of crimes against Asian-Americans.  So that might affect my judgment, maybe.  I'm not sure."[3]
      When the judge clarified that the defendant was of Asian heritage and asked, "Is there anything about that that would affect your ability to be fair and impartial?" the juror responded, "Maybe I might be more lenient towards Asian people."  The juror then repeated that her ability to be fair and impartial "[c]ould be" affected.  Asked again whether she believed she could be impartial, the juror responded, "I could.  It's just I think I might have the tendency to be more lenient towards Asian people."  She then said, "I think I can," when asked whether she would "be able to be impartial and base [her] verdict only on the evidence."  
      At a sidebar, the Commonwealth challenged juror no. 23 for cause.  The prosecutor noted that "the potential juror indicated her bias toward individuals of Asian descent given her own," and said, "She is an Asian-American and she indicated she would be more lenient towards individuals of her own ethnicity or origin."  The prosecutor concluded, "Just based on the bias she has already noted, the Commonwealth believes that this juror cannot be fair and impartial."  The defendant opposed the challenge.  The judge then asked the juror a series of follow-up questions, culminating with, "Do you believe that you can listen to this case and be fair and impartial and base a verdict only on the evidence?" to which the juror answered, "Yes, I can."  
      The judge denied the prosecutor's for-cause challenge to the juror.  The Commonwealth then sought to exercise a peremptory strike.  The prosecutor explained,
"[T]he challenge is not striking on the basis that this individual is of an Asian descent.  The Commonwealth is striking on the basis that I am unsure about whether or not she will be able to, as I stated in the for cause challenge, I'm not sure she'll be able to set aside her affinity towards other individuals, not necessarily because she is of Asian descent, but rather because she is bringing a bias into the courtroom . . . ."  
The defendant objected.  The judge focused on whether the Commonwealth had demonstrated an adequate and genuine basis for its challenge.[4]  See Commonwealth v. Kozubal, 488 Mass. 575, 582-583 (2021), cert. denied, 142 S. Ct. 2723 (2023).
      After summarizing the prosecutor's argument and offering the defendant an opportunity to respond, which she declined, the judge ruled, "I think the articulated reasons by the Commonwealth for the juror's initial feeling that she would not be fair and impartial and expressed bias is a genuine and adequate reason and that it does not involve race per se but more the juror's own inclinations."  Accordingly, she allowed the exercise of the peremptory challenge.
      This was not an abuse of discretion or error of law.  Neither the prosecutor nor the trial judge was required to ignore the fact that the juror spontaneously raised her own potential bias, nor that she six times reiterated it or equivocated about whether her verdict could be based solely on the evidence.  This self-identified bias was "clear and reasonably specific," "personal to the juror and not based on the juror's group affiliation,"[5] and "related to the particular case being tried" (citation omitted).  Maldonado, 439 Mass. at 464-465.  Thus, it was "adequate."  While the juror ultimately said she could be fair and impartial, that did not require the Commonwealth to ignore the juror's prior responses.  See Prunty, 462 Mass. at 305 ("The scope of the peremptory challenge exceeds that of the 'for cause' challenge to permit a party to eliminate those jurors perceived as harboring subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge" [quotation and citation omitted]). 
      We similarly see no error in the judge's conclusion that the articulated reason for the strike was "genuine," i.e. "in fact the reason for the exercise of the challenge" (citation omitted).  Id. at 309.  As the judge recognized when she restated the reason for the prosecutor's peremptory challenge, it was based on the same ground as that articulated in the prosecutor's for-cause challenge, namely the potential juror's many-times articulated belief "that she would be inclined to be more lenient for her reason."  "If there is a readily apparent, group-neutral reason that already has been raised by the striking party in a for-cause challenge . . . that might cut against the inference of a discriminatory intent."  Sanchez, 485 Mass. at 513 n.17.  We discern no error in the judge's conclusion that the juror's bias was in fact the prosecutor's reason for the strike, and we will not disturb it.
      2.  Sufficiency of evidence and jury instructions (larceny).  The defendant maintains that the evidence was insufficient to prove larceny over $250 from a person over sixty.  Her argument rests on provisions of the Federal Truth in Lending Act, which limits cardholders' liability for unauthorized credit card charges.  15 U.S.C. § 1643.  See DBI Architects, P.C. v. American Express Travel-Related Servs. Co., 388 F.3d 886, 889 (D.C. Cir. 2004).  The defendant contends that the money was not actually stolen, since the Truth in Lending Act shielded the victim from full liability for the unauthorized charges to her credit cards.  She further asserts that, as a consequence, the victim of the theft was not over sixty because, although the named victim was seventy-seven, she was not actually deprived of the money.  
      We review under the familiar Latimore standard.  See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  Under G. L. c. 266, § 30 (5), the Commonwealth was required to prove that:  (1) the defendant stole property valued at more than $250 (2) from a person aged sixty years or older (3) with the intent permanently to deprive that person of the property.  Compare Commonwealth v. Sollivan, 40 Mass. App. Ct. 284, 287 (1996).
      The evidence amply supports the conviction.  The defendant used the victim's American Express card, as well as a Discover card fraudulently opened in the victim's name, to buy tens of thousands of dollars' worth of merchandise, much of which was found in the defendant's apartment.  The victim was unaware of, and did not authorize, these purchases, which were made in her name, using her e-mail address, and shipped to the building that she owned (and where the defendant lived).  From the fact that the items were found in the defendant's apartment, in packages addressed to her, and included thousands of dollars' worth of gift cards addressed to the defendant, the jury could reasonably conclude that the defendant did not intend to return the money used to purchase the items.  The jurors were not required to credit the defendant's testimony that she intended to return the money.
      We similarly discern no error in the instructions that permitted the jury to find that the defendant intended to permanently deprive the victim of her money.  The judge's initial instruction informed the jury of its obligation to convict only if it was satisfied that the defendant "intended to deprive [the victim] of the property permanently," that such intent "may be inferred where a person takes property without the owner's permission and then uses or disposes of it in a way that shows indifference as to whether the owner recovers possession," and that such intent "can be inferred from the [d]efendant's words or conduct."  See Sollivan, 40 Mass. App. Ct. at 287.
      During deliberations, the jury sent the following question:
"Is the intent to commit a crime mitigated by intent to remediate the crime at a later date?  Specifically, if the defendant testified that she intended to return the money (from credit card purchases) does that mitigate the fact that she intended to use the credit card in an unauthorized fashion, in reference to larceny charge 'with the intent to deprive that person of the property permanently'"?  
      After conferring with counsel, and with defense counsel's assent, the judge instructed the jury that they "must consider the [d]efendant's intent, the [d]efendant's state of mind as I've described it to you, at the time of the commission of the crime."
      "We evaluate jury instructions as a whole and interpret them as would a reasonable juror."  Commonwealth v. Marinho, 464 Mass. 115, 122 (2013).  "We do not require that judges use particular words, but only that legal concepts are properly conveyed."  Id.  "Because the defendant did not object to the jury instruction at trial, we review [her] claim to determine first whether there was error, and if so, we then inquire whether the error created a substantial risk of a miscarriage of justice."  Id.  Taken as a whole, the original and post-jury-question instructions properly put the jury's focus where the law requires, on the defendant's intent at the time of the commission of the crime.
      3.  Money laundering.  The Massachusetts money laundering statute provides, in pertinent part:
"Whoever knowingly . . . (2) engages in a transaction involving a monetary instrument or other property known to be derived from criminal activity . . . (ii) knowing that the transaction is designed in whole or in part . . . to:  (A) conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity . . . shall be guilty of the crime of money laundering . . . ."
G. L. c. 267A, § 2 (2) (ii) (A).  Applying the statute in a case involving stolen funds, the Supreme Judicial Court said:
"[T]o satisfy the requirement under G. L. c. 267A, § 2 (2) (ii) (A), that a transaction be 'designed in whole or in part . . . [to] conceal or disguise the nature, location, source, ownership or control' of stolen funds, the Commonwealth must demonstrate that concealment was an animating purpose of the transaction.  In other words, concealment must be proved to have been one of the purposes that motivated or drove the defendant to engage in the transaction, not merely an incidental attribute or effect of the transaction.  In making this determination, evidence that the structure of the transaction served to conceal a listed attribute of the funds will be probative of whether concealment was an animating purpose of the transaction." 
Commonwealth v. Braune, 481 Mass. 304, 311 (2019). 
      The State statute is closely modeled on the Federal money laundering statute, 18 U.S.C. § 1956.  "Where, as here, our State statute 'largely replicates' a cognate provision of Federal law, we consider the Federal courts' interpretation of the Federal statute 'highly persuasive' in interpreting our own law" (citation omitted).  Braune, 481 Mass. at 308.
      The defendant maintains that the evidence was insufficient to establish concealment money laundering, the only theory of money laundering submitted to the jury.  We review this claim, considering the evidence introduced at trial in the light most favorable to the Commonwealth, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, Latimore, 378 Mass. at 677-678, bearing in mind that guilt may be established by circumstantial evidence "and that the inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.'"  Commonwealth v. Linton, 456 Mass. 534, 544 (2010), quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007).
      The Commonwealth maintains the jury could have found sufficient evidence of money laundering based on either of two factual scenarios.  First, the defendant "stole and deposited twenty-four checks from the victim," made payable to the defendant, and, after depositing those checks in her own bank account over time, wired some of the stolen money to family members, falsely claiming to them that the money was the defendant's salary paid by the victim.  Second, the defendant used the victim's credit cards to buy gift cards for herself and others and, in so doing, included notations that would lead a reader to believe the cards were from others.    
      a.  Check deposits and wire transfers.  In assessing the first claim, we must disentangle the initial (theft) transactions from the later wire transfers.  Only the latter are susceptible of being criminal money laundering under the statute.  Even structured theft is just theft, only the first step in money laundering.  The statute criminalizes transactions "involving a monetary instrument or other property known to be derived from criminal activity," G. L. c. 267A, § 2 (2) (ii) (A); until it was stolen, the money was not "derived from criminal activity."  See, e.g., United States v. Phythian, 529 F.3d 807, 813 (8th Cir. 2008) ("For proceeds to be laundered, there must first be wrongfully obtained proceeds"; "Money laundering 'proceeds' are funds obtained from prior, separate criminal activity" [citations and quotation omitted]); United States v. Adefehinti, 510 F.3d 319, 323-324 (D.C. Cir. 2007) (rejecting theory that "would conflate the act of fraudulently obtaining money with the act of concealing it" because transactions must be distinct; reversing money laundering conviction based on deposit of fraudulent check and its subsequent transfers to defendants and their associates); United States v. Esterman, 324 F.3d 565, 569 (7th Cir. 2003) (cognate portion of Federal money laundering statute "calls for another transaction -- not the original unlawful activity -- that is designed in whole or in part to 'conceal or disguise' what is happening to the original proceeds").  That the defendant allegedly stole gradually, using deceptively endorsed checks, does not alter this analysis.  
      We next address the three wire transfers from the defendant's account, held in her name, to her father's and brother's bank accounts, held in their names.  By this point, the funds were "derived from criminal activity," having been stolen.  The question, then, is whether these transactions were "'designed in whole or in part . . . [to] conceal or disguise the nature, location, source, ownership or control' of stolen funds" -- that is, whether concealment of the illegal attribute was "one of the purposes that motivated or drove the defendant to engage in the transaction, not merely an incidental attribute or effect of the transaction."  Braune, 481 Mass. at 311.  
      Evidence probative of an intent to disguise or conceal includes: 
"statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals."
Braune, 481 Mass. at 313, quoting United States v. Garcia-Emmanuel, 14 F.3d 1469, 1475-1476 (10th Cir. 1994).  Of these (non-exhaustive) factors, only two are plausibly implicated here.  First, the defendant maintained, consistent with her defense, that the stolen money was salary, and testified that she had told her father and brother as much when she gave them the money.  Second, the money transfers went to third parties.[6] 
      We are not persuaded that there was sufficient evidence of money laundering to go to a jury.  The trial evidence was that the wire transfers were birthday gifts to the defendant's family members, not that these transfers were made "to conceal the real owner"; instead, the evidence showed that the defendant relinquished ownership of the stolen funds when she transferred the money to her family members.  This is insufficient to show intent to conceal.
      This leaves only the defendant's statements (to the police and in testimony) about having legitimately earned the stolen money.  In the absence of any other evidence, a jury could not conclude from these statements that "concealment was one of the purposes that motivated or drove [the defendant] to engage in the transaction in the first place" (citation and quotation omitted).  Braune, 481 Mass. at 310.  See Adefehinti, 510 F.3d at 322 ("The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds"); United States v. Johnson, 440 F.3d 1286, 1291-1292 (11th Cir. 2006), cert. denied, 552 U.S. 912 (2007) (reversing convictions based on defendant's five transfers of illegal assets to his mother's off-shore bank account; "no evidence of unusual secrecy, questionable structuring, highly irregular features of the transfers, or multiple movements of the same funds that assisted in concealing their original source"); Esterman, 324 F.3d at 570 (vacating money laundering convictions where defendant transferred funds to another account and then spent them; "the mere transfer and spending of funds is not enough to sweep conduct within the money laundering statute; instead, subsequent transactions must be specifically designed 'to hide the provenance of the funds involved'" [citation omitted]); Garcia-Emanuel, 14 F.3d at 1478 (affirming judgment of acquittal for concealment money laundering where defendant wired money from his own bank to bank account of another; absent "evidence of an unusual structure to this transaction, of undue secrecy surrounding it, or of any attempt to avoid attention," evidence insufficient to support concealment money laundering conviction).  
      b.  Use of the victim's credit card to buy gift cards.  Time after time, the defendant used the victim's credit card to buy gift cards, worth thousands of dollars, carefully taking the time to inscribe the "gifts" with notes designed to make it appear that someone else had purchased the cards for her.  At first blush, viewing the evidence in the light most favorable to the prosecution, the notes could be viewed as designed to conceal the source of the funds; they purport to be gifts to the defendant from others and their purchase, through unauthorized use of the victim's credit card, was theft.
      On closer inspection, however, this theory fails for the same reason described earlier:  the funds were not "property derived from criminal activity" until after the defendant stole them.  See Phythian, 529 F.3d at 813; see supra at     .  While the annotations on the gift cards are deceptive, intentionally so, they are not "transactions."  The statute criminalizes transactions.  See G. L. c. 267A, § 2 (2) (ii) (A).
      The defendant committed a crime, but it was not money laundering.  Because "[a]ny purchase of goods or services, whether by cash or by check, has a potential to conceal or disguise proceeds simply because it transforms them from money into objects or dissipates them in the performance of the services," "every expenditure of proceeds known to be tainted would itself be unlawful" if that alone were enough.  United States v. Corchado-Peralta, 318 F.3d 255, 259 (1st Cir. 2003).  As is often repeated in the Federal cases, "this is a concealment statute –- not a spending statute."  Garcia-Emanuel, 14 F.3d at 1476.  The evidence here showed only spending, so the money laundering conviction must be reversed.
      c.  Expert trial testimony.  Although not necessary to our decision, we pause to address the defendant's claim that trial testimony by the Commonwealth's money laundering expert was improper.  "Expert testimony is admissible if reliable, relevant, and helpful to the jury in understanding matters 'outside their common experience.'"  Commonwealth v. Robinson, 493 Mass. 303, 319 (2024), quoting Commonwealth v. Hinds, 487 Mass. 212, 217-218 (2021).  "[E]xpert testimony on matters within the [expert]'s field of expertise is admissible . . . even if the expert's opinion touches on the ultimate issues that the jury must decide."  Commonwealth v. Mendrala, 20 Mass. App. Ct. 398, 403 (1985), quoting Simon v. Solomon, 385 Mass. 91, 105 (1982).  However, "a general expression of . . . [an] opinion of guilt, followed by a recital of all the evidence against the defendant, is not permitted."  Commonwealth v. Lodge, 431 Mass. 461, 467 (2000). 
      The expert's testimony ran afoul of these well-established evidentiary rules.  First, he was permitted to testify from an exhibit captioned "Examples of Money Laundering," which listed transactions from the defendant's bank account, directly expressing the expert's view on the ultimate legal issue -- that the defendant was guilty of money laundering.  The expert also testified that certain transactions shown on the exhibit were "examples of illegal tender" and others were disguising illegal tender "to make it look like it originated from legal tender."  It was error for the expert to testify to these legal conclusions, but given our conclusion that the defendant's conviction of money laundering (the only indictment to which the witness's testimony related in any significant way) must be vacated, we need not decide whether the error presented a substantial risk of a miscarriage of justice.  
      Conclusion.  The judgment on the indictment charging the defendant with larceny is affirmed.  The judgment on the indictment charging the defendant with money laundering is reversed, the verdict is set aside, and judgment is to enter for the defendant.
                                          
So ordered.
footnotes

          [1] The defendant was found not guilty of a second larceny count (checks) and the jury was unable to reach a verdict on the other counts.  
          [2] These included a $1,000 gift card from the Barbara Lynch Group, four $500 gift cards to Bella Sante, and numerous other gift cards to Coje Restaurant Group, the Capital Grille, the Mandarin Oriental, Air Canada, Grill 23 & Bar, Target, Starbucks, and Chipotle, as well as Visa gift cards.   
          [3] The case was tried in June 2022, two years into the COVID-19 pandemic, which saw an increase in anti-Asian racism and hate crimes.  U.S. Commission on Civil Rights, The Federal Response to Anti-Asian Racism in the United States, at 82-83 (Sept. 27, 2023), https://www.usccr.gov/files/2023-09/fy-2023-se-report_0.pdf [https://perma.cc/9YC3-FSC3] (compiling FBI data showing a total of 158 anti-Asian hate crimes in 2019, 279 in 2020, and 746 in 2021).
          [4] Our analysis is unchanged by the fact that, later in the sidebar discussion, the prosecutor added a second reason for her peremptory strike, namely a concern that the prospective juror might not be able to follow the financial transactions at issue in the case.  The judge dismissed this, noting that juror no. 23 had a Ph.D. and was a biostatistician.  We are not persuaded that the eleventh hour addition of this reason signaled any discriminatory motive on the part of the prosecutor, but regardless, the judge's reasoning made clear that she accepted as the adequate and genuine reason for the peremptory that the prospective juror had, many times, indicated "that she believes that she would be inclined to be more lenient" to the defendant.  This conclusion is supported by the record and we will not disturb it.  See Prunty, 462 Mass. at 304.
          [5] We are not persuaded by the defendant's argument that the prosecutor's explanation was "based on the prospective juror's suspected 'group affiliation' with people who are Asian," and was "no more than a 'gut' feeling."  There is no prohibition on an attorney's considering what a juror says about his or her own biases, and the transcript reveals that the prospective juror affirmatively and repeatedly articulated hers.
          [6] For reasons addressed later in this opinion, we do not include the money-laundering expert's testimony in our analysis.